J-S14036-19

2019 PA Super 173

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
:                     PENNSYLVANIA
:
v.                                 :
:
:
:
DANTE T. JORDAN,                    :
:
Appellant        :    No. 545 EDA 2017

Appeal from the Judgment of Sentence January 13, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008738-2015,
CP-51-CR-0008739-2015

BEFORE:   LAZARUS, J., NICHOLS, J., and PELLEGRINI*, J.

OPINION BY PELLEGRINI, J.:                         **FILED MAY 29, 2019**

Dante T. Jordan (Jordan) appeals from the aggregate judgment of sentence imposed by the Court of Common Pleas of the First Judicial District (trial court) of 37½ to 100 years' incarceration following his convictions for Conspiracy, Attempted Homicide and other related crimes. He raises a number of challenges to his convictions contending that he is entitled to both discharge and a new trial. While we find that Jordan is not entitled to discharge, we hold that his right to a public trial was violated when the trial court excluded his family members from *voir dire*. We, therefore, remand for a new trial.

**I.**

**A.**

---
*   Retired Senior Judge assigned to the Superior Court.

On June 11, 2015, Tia Hughes was driving her co-worker Troy Green home after their shifts ended, which she did every day on the same route. At approximately 5:15 p.m., while stopped at a stop sign on 5200 Akron Street, at the intersection of Akron and Pratt Street, Hughes heard gunfire.[1] She froze, leading Green to step on the gas. Hughes heard more shots and saw her back window shatter. She did not see the shooter but thought the bullets came from the passenger's side. After driving the vehicle to a safe spot, Hughes realized that she and Green had both been shot and went to the hospital. Green, who did not testify, received treatment for his wounds. Hughes received pain medication and was discharged.

Five witnesses saw parts of the incident: Milagros Rivera, April Negron, Yanielle Negron, Terrence Hailey and Elizabeth Green (no relation). All witnesses except Rivera saw the shooting and all identified Brian King as the gunman. However, a number of these witnesses testified to seeing Jordan with King near the scene of the crime. Rivera, who lived on Akron Street and knew Jordan as he lived on Akron, testified that she got home from work around 4:20 p.m. As she parked her car, she observed Jordan and King together. About an hour later, she was on her porch and heard shots but did

---

[1] Eyewitness Milagros Rivera called police immediately after the shooting. Detective George Sullivan testified that the call came in at 5:20 p.m.

not see the shooter. Almost immediately afterwards, she saw Jordan run past her house holding a gun, wrapped in a shirt. She then called the police.

Both Yanielle Negron and Hailey and saw Jordan with King about twenty minutes before the shooting. Elizabeth Green testified that she was on the corner smoking a cigarette when she saw "guys on the corner on the opposite side." After five to ten minutes, she saw King cross the street and shoot. She saw Jordan "before the shooting sitting at the corner" of Akron and Pratt and estimated that he was there five to ten minutes before the shooting. None of the witnesses overheard any kind of conversation between King and Jordan.

Officer Christopher Sharamatew, a member of the SWAT unit, responded to Jordan's home at 5211 Akron Street. Officer Sharamatew and his partners issued commands for the occupants to exit the residence. Two black males, approximately forty to fifty years old, exited. Jordan followed a few minutes later. Detective Robert Hagy executed a search warrant on the property the next day. In the basement, he removed the furnace door and recovered two handguns: a .40 caliber and .22 caliber; the former weapon had two live rounds. The furnace contained additional rounds of ammunition for both weapons. The Commonwealth also established that twelve fired cartridge casings were recovered from Akron street plus a bullet fragment from Hughes's vehicle. Officer Robert Stott compared the fired cartridge casings and recovered fragments to test firings from the .40 caliber pistol

recovered from the furnace, and opined that all specimens were fired from that gun.[2]

The Commonwealth also established that Jordan had a possible motive for the shooting. Rivera testified that in the spring of 2015, she saw a heated dispute between two groups. One of the groups included Jordan and his brother while the other included Green. Rivera was cross-examined with her prior testimony, wherein she stated that Green "was screaming at [Jordan's brother] to come out of the house, that you disrespected me, you'll see what I can do to you and your house and your crew, I'll just come back and shoot everything up, and he was very loud about it." N.T., 10/14/16, at 42.

**B.**

The Commonwealth charged Jordan at two separate dockets.[3] At case number 2015-8738, the Commonwealth charged Aggravated Assault, Attempted Homicide, Conspiracy, Carrying a Concealed Firearm, Carrying a Firearm in Philadelphia, Possessing an Instrument of Crime, and Tampering. The first three crimes named Green as the victim. At case number 2015-8739, the Commonwealth charged Aggravated Assault and Attempted

_____

[2] The additional .40 caliber ammunition recovered from the furnace was not the same brand and make as the casings recovered from the crime scene. N.T., 10/17/16, at 97.

[3] Jordan and King were scheduled for joint trial but King accepted a negotiated guilty plea immediately prior to trial. He did not testify against Jordan.

Homicide, with Hughes listed as the victim. After a jury trial, where the jury was charged that he could be found guilty if he was found to have entered into a conspiracy or was an accomplice, Jordan was convicted of all charges and received an aggregate sentence of 37½ to 100 years' incarceration.[4] Jordan then timey filed the instant appeal.

## II.

While Jordan raises a number of issues on appeal, we will first address his challenges to the sufficiency of the evidence as success on that basis will result in discharge instead of retrial. **See Commonwealth v. Coleman**, 130 A.3d 38, 41 (Pa. Super. 2015). Jordan's sufficiency claims relate to the convictions for both counts of Aggravated Assault, Attempted Murder, Conspiracy and Possession of a Concealed Firearm.[5] He claims that the

_____

[4] The Commonwealth concedes that the sentence is illegal. Additionally, we note that the parties do not discuss the applicability of 18 Pa.C.S. § 906 ("A person may not be convicted of more than one of the inchoate crimes of criminal attempt, criminal solicitation or criminal conspiracy for conduct designed to commit or to culminate in the commission of the same crime."). Because we hold that Jordan is entitled to a new trial, these sentencing issues are moot.

[5] The standard of review for these claims is set forth by **Commonwealth v. Sunealitis**, 153 A.3d 414, 419 (Pa. Super. 2016) as follows:

Our standard of review is well-settled.

In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as

Commonwealth did not establish beyond a reasonable doubt that Jordan and King had agreed to enter into a criminal conspiracy with the shared intent to kill Green or that he was an accomplice to the attempted homicide crimes. Because there is no dispute that King fired the gun and Jordan was charged as if he pulled the trigger, the question is whether the circumstantial evidence established accomplice liability and/or conspiratorial agreements beyond a reasonable doubt. To better discuss Jordan's challenges, we briefly examine those matters.

**A.**

Accomplice liability is statutorily defined as follows:

**Accomplice defined.--**A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

---

verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Further, the trier of fact is free to believe all, part, or none of the evidence.

***Commonwealth v. Woodard***, 129 A.3d 480, 489–90 (Pa. 2015) (citations omitted). "Whether sufficient evidence exists to support the verdict is a question of law; our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Tejada***, 107 A.3d 788, 722 (Pa. Super. 2015).

> > (ii) aids or agrees or attempts to aid such
> > other person in planning or committing it;
> > . . . .

18 Pa.C.S. § 306(c).  To be guilty as an accomplice for first-degree murder, the Commonwealth is required to establish a specific intent to kill.  "[A] defendant cannot be convicted of first-degree murder under a vicarious liability theory, such as accomplice or conspiratorial liability, unless the fact-finder determines, upon proof beyond a reasonable doubt, that the defendant personally harbored a specific intent to kill."  ***Commonwealth v. Smyrnes***, 154 A.3d 741, 746 (Pa. 2017) (citations omitted).  ***See also Commonwealth v. Barnett***, 121 A.3d 534, 544 (Pa. Super. 2015) ("A person is only responsible as an accomplice for first-degree murder if he possesses the requisite specific intent to kill.").  Since aggravated assault is also a specific intent crime, the same analysis applies.[6]

Accomplice liability requires only aid, not an agreement.  ***See Commonwealth v. Murphy***, 844 A.2d 1228, 1238 (Pa. 2004) ("The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators."). Conspiratorial liability is "a theory in which one conspirator is criminally liable

---

[6] The aggravated assault statute is disjunctive and encompasses both attempts to inflict serious bodily injury and actual infliction of serious bodily injury.  The Commonwealth now concedes that Hughes and Green did not suffer serious bodily injury making the attempted aggravated assault crimes lesser-included offenses of the attempted homicides.

for the substantive offenses committed by other members of the conspiracy that are undertaken in furtherance of the conspiracy." ***Commonwealth v. Chambers***, 188 A.3d 400, 408 (Pa. 2018). Accomplice liability can be established by circumstantial evidence. In meeting its burden, the Commonwealth may rely wholly upon circumstantial evidence. ***See Commonwealth v. Macolino***, 469 A.2d 132 (Pa. 1983).

The Commonwealth alleges that the evidence, although circumstantial, establishes beyond a reasonable doubt that Jordan is liable for the attempted murder convictions under both accomplice and conspiratorial liability. It contends that Jordan specifically intended for Green to die as he had a motive and Jordan aided King by supplying him with the gun and/or solicited King to commit the crime on Jordan's behalf.[7]

**B.**

The substantive crime of Conspiracy overlaps to a significant if not complete degree with conspiratorial liability since an agreement is a necessary component of both. "The criminal union being prosecuted cannot be based

---

[7] Jordan does not separately address the conviction for crimes against Hughes from the convictions for crimes against Green. However, once the crime of Conspiracy is established, he was liable for crimes committed by King under the conspiratorial liability scheme. Furthermore, we note that the doctrine of transferred intent, 18 Pa.C.S. § 303, may or may not apply under an accomplice theory notwithstanding the lack of specific intent against Hughes, because King risked her death when attempting to achieve the conspiratorial objective of murdering Green. ***See e.g. Commonwealth v. Thompson***, 739 A.2d 1023 (Pa. 1999) (transferred intent applies to inchoate crimes).

upon an agreement to complete a broad, undefined objective at some unknown point. Rather, the agreement must rest upon the mutual specific intent to carry out a particular criminal objective." *Chambers*, 188 A.3d at 410. That crime is defined as follows:

> **(a) Definition of conspiracy.--**A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
>> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>>
>> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903. "Simplified, this requires proof of three elements: 1) an agreement, 2) shared criminal intent, and 3) an overt act." *Commonwealth v. Johnson*, 180 A.3d 474, 479 (Pa. Super. 2018).

In *Chambers*, our Supreme Court recently described the elements of a conspiratorial agreement and the difficulties in proving them:

> At "the heart of every conspiracy" lies the "common understanding or agreement" between the actors. *Commonwealth v. Kennedy*, 499 Pa. 389, 453 A.2d 927, 929 (1982) (citations omitted). "Implicit in any conspiracy is proof ... that an accused agrees to participate in the alleged criminal activity." *Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208, 210 (1983). The criminal union being prosecuted cannot be based upon an agreement to complete a broad, undefined objective at some unknown point. Rather, the agreement must rest upon the mutual specific intent to carry out a particular criminal objective. "The *sine qua non* of a conspiracy is the shared criminal intent." *Weston*, 749 A.2d at 463 (citing *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456, 464 (1998), quoting *Commonwealth*

- 9 -

*v. Schomaker*, 501 Pa. 404, 461 A.2d 1220 (1983) ). "Without this common purpose, a conspiracy cannot be maintained." *Derr*, 462 A.2d at 209.

Proving the existence of such an agreement is not always easy, and is rarely proven with direct evidence. *Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 592 (1998). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Strantz*, 328 Pa. 33, 195 A. 75, 80 (1937). Indeed, "[a] conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed." *Kennedy*, 453 A.2d at 930.

\*\*\*

Each case must be evaluated on its own set of facts. Despite the variable circumstances under which a conspiracy can form, particularly in assault cases, it is axiomatic and well-established that "persons do not commit the offense of conspiracy when they join into an affray spontaneously, rather than pursuant to a common plan, agreement, or understanding." [*Id*.]

*Id*. at 410-11.

As conspiracy by its nature is often difficult to prove due to an absence of direct evidence, cases examining the sufficiency of the evidence often look to the "conduct of the parties and the circumstances surrounding their conduct [which] may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Commonwealth v. Lambert*, 795 A.2d 1010 (Pa. Super. 2002).

Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime;

- 10 -

and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

*Id*. Other circumstances which are relevant include post-crime conduct, such as flight, because it tends to establish consciousness of guilt. When combined with other direct or circumstantial evidence, that conduct may provide sufficient evidence to establish a conspiracy. *See Commonwealth v. Knox*, 50 A.3d 749, 755-56 (Pa. Super. 2012).

## III.

### A.

Jordan maintains that the Commonwealth failed to establish beyond a reasonable doubt that he was either an accomplice or conspired with King to murder Green. Prior to the shooting, all the Commonwealth established was his presence at the scene of the crime. As to his actions after the shooting, Jordan argues that those acts cannot be related back to support the notion he must have conspired with King to commit the crimes. He contends that, at most, the evidence showed that he gained possession of a gun at some point and then hid it which only established that he may have aided and abetted King after the shooting occurred.

Moreover, he argues that his receipt and concealment of the firearm is best characterized as giving aid after-the-fact which does not make one an

accomplice.[8]  *See Commonwealth v. Spence*, 627 A.2d 1176, 1183 (Pa. 1993) ("An accessory after the fact is not an accomplice.  Since all of Rosenblum's actions occurred after the crime, she could not have facilitated the commission of the crime and therefore was not an accomplice[.]").

We agree that Jordan's mere presence and/or his taking and concealing the firearm cannot, in isolation, be used to prove a conspiracy.  But that is not to say his presence and post-crime conduct are irrelevant when reviewing the sufficiency of the evidence.  Here, the "web of evidence" establishes that Jordan was not "merely present" as he fled the scene with the firearm used in the shooting which he obtained from the actual gunman.[9]  To the contrary,

_____

[8] "Accessory after the fact" is now codified at 18 Pa.C.S. § 5105 as Hindering Apprehension or Prosecution.

[9] In support, Jordan discusses a number of cases presenting factual circumstances that he alleges are sufficiently analogous to this case, such as *Commonwealth v. Cunningham*, 447 A.2d 615 (Pa. Super. 1982) (fact that defendant identified victim as a burglar to the murderer was insufficient to establish that he was an accomplice in the murder); *Commonwealth v. Flowers*, 387 A.2d 1268 (Pa. 1978) (defendant, who introduced undercover agent to drug seller only after agent requested drugs, and who did not actively participate in the actual subsequent transaction, was not an accessory before the fact for sale of marijuana); *Commonwealth v. Prado*, 393 A.2d 8 (Pa. 1978) (No *prima facie* case for murder when all that was shown was that defendant came from an alley after the shooting and where no witnesses to the shooting testified); *Commonwealth v. Swerdlow*, 636 A.2d 1173, 1178–79 (Pa. 1994) (evidence that alleged co-conspirator used crawl space located in front bedroom of home in which defendant resided with his mother in order to break into and steal property from two neighboring homes was insufficient to support conspiracy conviction.).  These cases all apply the well-settled principles regarding mere presence to their particular facts.

that evidence establishes that Jordan and King were engaged in a conspiracy and that Jordan was an accomplice.

While no one could pinpoint Jordan's whereabouts during the shooting itself, it is obvious that Jordan did not stray far: Milagros Rivera testified that she saw Jordan running towards his house while holding a firearm **immediately** after the shots rang out. ("Q: How long was [*sic*] before you saw this man running with the gun, as best as you can remember, after the gunshots ended?" "A: Immediately."). N.T., 10/14/14, at 19-20. Moreover, multiple witnesses placed Jordan on the scene for some time both leading up to the shooting and shortly before the shooting itself.

The testimony also established that Jordan rejoined King immediately after the shooting and assisted King in concealing the gun by hiding it in the furnace of his home, all of which indicates that he conspired with and abetted King in the attempted murder. This conduct here is analogous to that of a getaway driver, and cases examining conspiracies in those situations often emphasize post-crime conduct as illustrative of intent. *See Commonwealth v. Brown*, 505 A.2d 295, 297 (Pa. Super. 1986) ("A jury could find that appellant's presence outside the Johnson home, where he had no cause to be, sitting behind the wheel of a car, which he then used to transport the stolen Johnson television set and the thief away from the scene of the crime, was not merely fortuitous."); *Commonwealth v. Azim*, 459 A.2d 1244 (Pa. Super. 1983) (*per curiam*) ("Conspiracy to commit burglary has been found

where the defendant drove codefendants to the scene of a crime and then later picked them up.") (citation omitted); **Commonwealth v. Esposito**, 344 A.2d 655, 656 (Pa. Super. 1975) ("She was the driver and custodian of the getaway car, on whose person the police found some remnants of the day's booty. While it is true that there was no direct evidence of an unlawful agreement, such an agreement can readily be inferred from appellant's conduct.").

In this case, the evidence showed that Jordan and King were seen together for some time both leading up to the shooting and shortly before the shooting, and that Jordan took the gun after the shooting and hid it.[10] Additionally, Jordan had previous associations with King, a motive to kill, knowledge that Green took the same route home every day, and additional .40 caliber ammunition was found in the gun's hiding place, leading to an inference that Jordan supplied the gun to King. From this "web of circumstances" the jury could thus reasonably determine beyond a reasonable doubt that Jordan and King entered into a criminal agreement to kill Green,

---

[10] Jordan maintains that King's actions were a total surprise. "What surely occurred is that King saw Green in the car and saw it as an opportunity to shoot him." (Jordan's Brief at 30). The jury was entitled to accept that explanation. Similarly, the jury was permitted to reject that version of events and find that when Jordan failed to immediately distance himself from an apparently random shooting, but instead met the gunman and took the gun, that the shooting was anything but random.

that Jordan aided King in his attempt to kill Green, and that Jordan shared King's specific intent with respect to every aspect of their criminal undertaking. Jordan is, therefore, not entitled to discharge.[11]

**IV.**

We now address Jordan's allegation that his Sixth Amendment right to a public trial was violated when the court closed the courtroom during *voir dire*. Specifically, he argues the court erred in excluding his mother and stepfather from the proceedings. We hold that the trial court was justified in excluding general members of the public from *voir dire* due to intimidation concerns. However, the court erred by refusing to consider the proffered reasonable alternative of permitting entry to Jordan's family members. We, therefore, reverse and remand for a new trial.[12]

**A.**

The events that precipitated the trial court's ruling are not entirely clear. The Commonwealth states that this claim is "arguably waived" because the

---

[11] We summarily dispose of Jordan's contention that the firearm was not completely concealed when he ran from the shooting. He concedes that Rivera observed the firearm "partially covered" by Jordan's shirt. In **Commonwealth v. Montgomery**, 192 A.3d 1198 (Pa. Super. 2018), *appeal granted*, 2019 WL 1123191 (Pa. 2019), we held that "*any* concealment, even partial, is sufficient to satisfy the concealment element of the crime." **Id**. at 1201 (emphasis in original). The concession that the firearm was partially covered ends the inquiry under **Montgomery**, which is not cited by Jordan.

[12] Since we have granted a new trial on these grounds, we need not address Jordan's remaining points of error.

certified record does not contain the transcript from the proceedings on October 11, 2016. Jordan states that he "objected to the closing of the courtroom during jury selection thereby preserving the issue for appellate review." (Jordan's Brief at 52).

It is not clear what, if anything, happened on October 11, 2016. The record includes a transcript for October 12, 2016, which is captioned "Plea/Jury Trial Day 1." At the beginning of this transcript, the trial court remarks:

> **THE COURT**: When the trial does start, I understand that you spoke to the group we had yesterday. They'll be limited in terms of how many people can be in this room. I haven't decided a number yet. Anyone that does come, must produce identification before they are seated, because I'm not going to have any difficulties. That will start tomorrow. My best hope is that we select our jury today, and we'll see how that goes.

N.T., 10/12/16, at 4. No reference is made to closing the courtroom for *voir dire* nor to any kind of incident occurring the previous day. Jury selection proceeded, with eight jurors picked by the end of day. (THE COURT: "Juror eight. Okay. That's the end of our panel for today."). *Id*. at 122. The transcript for October 13, 2016, begins with this exchange:

> MR. O'HANLON: I believe Tuesday [October 11], when I wasn't here, there was an issue with witnesses. However, my client's family was here yesterday and excluded from jury selection and they feel excluded again. **I would note my objection to that. They didn't cause any problems and it's part of the trial.** It's supposed to be an open court.
>
> THE COURT: So what occurred in your absence, sir, was a group of approximately 30 people barreled the[ir] way into my courtroom in an intimidating manner. I don't know who belonged

- 16 -

to who, but they were here with respect to Mr. King and Mr. Jordan. It was so intimidating that the affect upon the complainants and witnesses that were present, they voiced their concern about their safety, even physically, being within the building.

So while I understand the[ir] desire to observe, it is because of that reason for jury selection particularly and particularly in view of the other debacle that I had.

The case before this I had similar occurrences resulting in jurors feeling like they were intimidated. I'm not going to have that here. So in an ounce of caution, based upon the behavior I saw among the folks present, which unfortunately you were not here for, it was quite concerning. So I'm not going to have it.

MR. O'HANLON: But --

THE COURT: Excuse me, sir. If I may, I note your objection. But for jury selection, particularly when I'm interviewing jurors for their concerns of privacy and the Court's concern with respect to this matter, that's how we're going to handle it. So once we're finished jury selection, folks can come in in limited numbers, and folks must provide identification before they enter. I made that plainly clear on the record from the beginning of this case.

MR. O'HANLON: Your Honor, just with regard to my client's mother, she's in her mid-50s and his step father is in his mid-60s. **They were here on Tuesday. They didn't cause any trouble**. **So based upon that, I would request they be allowed to stay in the room.**

THE COURT: Once jury selection is completed, they're welcome to come in, but my ruling stands.

MR. O'HANLON: Thank you, Your Honor.

N.T., 10/13/16, at 4-6 (emphases added). The parties then completed jury selection. The trial court's opinion explains its decision to close the courtroom during *voir dire*:

- 17 -

> This Court properly protected the safety of all persons within the courtroom due to the threatening behavior of that throng of persons that had stormed into the courtroom as if they were attending an outdoor brawl. Concern for the intimidated witnesses was particularly important because most of them still lived in the same two block radius of the defendant and their family members and friends.
>
> This Court was particularly concerned about the potential chilling and privacy of the potential jurors. Potential jurors faced with such immediate pressure would tend to refuse to serve for fear of retribution. Others potentially could impute the same ill will that they had observed within the group that had acted so poorly to each of defendants who were facing trial. This could have caused potential jurors to ignore the presumption of innocence instruction.

Trial Court Opinion, 8/29/18, at 12.

The trial court, therefore, agrees that the facts supporting its ruling were conveyed at the time Jordan levied his objection / requested an exception for his mother and stepfather. While it is debatable whether Jordan could have raised his claim earlier, *i.e.,* on day one of jury selection, the fact remains that the court refused his request to permit entry on day two.[13]

**B.**

A defendant has a Sixth Amendment right to a trial that is open to members of the public. *See **Waller v. Georgia***, 467 U.S. 39, 46 (1984).

---

[13] The waiver analysis becomes relevant if the court **granted** Jordan's request to permit entry on day two of jury selection. In such a case, we would be required to address whether (1) counsel could have raised the claim on day one, and (2) if the ability to observe day two of jury selection was sufficient. Because there is no dispute that the family members were excluded for the entirety of *voir dire*, we find that the issue was properly preserved.

That right is for the benefit of the accused and ensures "that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...." *Id*. (citations omitted). "Confidence in our system of jurisprudence is enhanced by such openness." *Commonwealth v. Berrigan*, 501 A.2d 226, 232 (Pa. 1985). Thus, the accused has the right to have the public attend *voir dire*.

In *Waller*, the United States Supreme Court discussed when and to what extents a courtroom could be closed. In that case, the prosecution requested that the trial court close a suppression hearing involving wiretaps because some of the material on the recorded conversations involved unnamed persons who were not yet indicted. The State further argued that the evidence would be tainted if disclosed in public. The trial court agreed and closed the courtroom. Waller was then convicted after a jury trial. The Supreme Court reversed, holding that while an accused has the right to a public trial, the right is not absolute. Closing a courtroom is permissible if the following requirements are met: (1) there is "an overriding interest that is likely to be prejudiced," (2) the closure is "no broader than necessary to protect that interest," (3) the trial court considers "reasonable alternatives" to closure, and (4) the trial court makes "findings adequate to support the closure." 467 U.S. at 48.

While **Waller** dealt with the closing of a courtroom for reasons other than order in the courtroom, witness intimidation or jury intimidation, in **Berrigan**, our Supreme Court addressed the standards that are to be used when those considerations were at issue. In that case, multiple defendants were charged with various offenses for trespassing into a General Electric plant, destroying missile components with hammers, pouring human blood on the premises and causing some $28,000.00 in property damage. That trial court excluded members of the general public from the courtroom during the *voir dire* proceeding for events our Supreme Court described as follows:

> The [defendants] . . . brought to the attention of the trial judge that a multitude of demonstrators or people had gathered on the steps outside the courthouse. [They] feared that this scene could be extremely intimidating upon prospective jurors who had to pass through these lines to gain entrance into the courthouse.
>
> Extremely disturbing incidents were occurring in front of the courthouse among police, demonstrators, and visitors. The police were having a difficult time controlling the people. On one occasion some fifteen (15) persons were arrested on charges of disorderly conduct. It was reported to the trial judge that a press person had been violently handled and his camera seized and thrown to the floor of a car.
>
> And the [defendants], understandably agitated from the events that were swirling about them, were having difficulty comporting themselves in the quiet, dignified, and measured manner which is essential to the conduct of a fair and impartial trial in our courts. They often allowed themselves to become disorderly and tumultuous. They repeatedly disrupted the proceedings by walkouts, demonstrations, singing, refusal to acknowledge the court, physical acts of defiance, persistent disregard of court rulings and verbal attacks upon prospective jurors. When spectators were in the courtroom, they, too, joined in the tumultuous and anarchistic behavior of the [defendants].

501 A.2d at 231.

Our Supreme Court held that "[w]here trial courts perceive a threat to the orderly administration of justice in their courtrooms by an unmanageable public, they may always place reasonable restrictions on access to the courtroom, so long as the basic guarantees of fairness are preserved[.]" *Id*. at 234. We have further explained that is the responsibility of the court to maintain not only the control but also the security of the courtroom, ***Commonwealth v. Pantano***, 836 A.2d 948 (Pa. Super. 2003), and that the right to a public trial "serves two purposes: (1) it prevents the accused from being subject to a Star Chamber proceeding; and (2) assures the public that the standards of fairness are being observed." ***Commonwealth v. Constant***, 925 A.2d 810, 817 (Pa. Super. 2007).

Moreover, in ***Presley v. Georgia***, 558 U.S. 209 (2010) (*per curiam*), the United States Supreme Court commented that there are "no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire*." 558 U.S. at 215.[14]

---

[14] In ***Presley***, the trial judge noticed a man observing the jury selection process. The judge informed him that he could not be present and had to leave the courtroom. Upon questioning, the judge learned that the man was the defendant's uncle. The judge stated there was "no need for the uncle to be present during jury selection," and expressed concern that there would not be enough room for the potential jurors if the public was welcome. The judge also feared that the uncle could "intermingle with the jurors" and potentially

However, even when "overriding interests" warrant closure, if the parties or the press petition the trial court to admit certain individuals, the trial court must consider that request and place on the record the reasons for denying the request. That requirement enables reviewing courts to examine whether exclusion was justified. Here, the question was whether exclusion of Jordan's family members was warranted in light of the overriding interest of controlling the courtroom and protecting the safety of potential jurors and the eyewitnesses.

**C.**

In examining whether the triggering event in this case was so serious as to qualify as an overriding interest, we accept the judge's description as set forth in the transcript and opinion. Additionally, we defer to the trial court's description of the effect that disturbance had on the potential jurors. We, therefore, find that the event described by the trial judge qualifies as concrete enough to warrant closing *voir dire* to the general public as an overriding interest.

However, we agree with Jordan that the trial court's failure to consider Jordan's request that his mother and stepfather be admitted to jury selection was an abuse of discretion, especially when it was alleged that they were not

cause jurors to overhear inadvertent comments. *Id*. at 211. The man was ejected and **Presley** held that he was entitled to a new trial because that was an insufficient reason to remove the defendant's uncle from jury selection.

part of the disturbance that caused jury selection to be closed. This is especially so since **Presley** cited **In re Oliver**, 333 U.S. 257, 271-72 (1948), where the United States Supreme Court remarked: "And without exception all courts have held an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." Therefore, an exclusion of the general public does not necessarily warrant the same treatment as to other discrete groups such as members of the press or family members. **See Weaver v. Massachusetts**, 137 S.Ct. 1899, 1909 (2017) ("[V]arious constituencies of the public—the family of the accused, the family of the victim, members of the press, and other persons—all have their own interests in observing the selection of jurors.). Indeed, in **Berrigan**, the exclusion order was not total, as "All members of the press, without limitation as to numbers, were freely admitted." 501 A.2d at 231.

That said, the trial judge could exclude Jordan's mother and stepfather had they participated in the disturbance, presuming that appropriate findings supporting that conclusion were made. Here, the trial court did not challenge Jordan's representation that his mother and stepfather, the only people Jordan sought to admit, were not part of the disturbance.[15] The trial court

---

[15] We note that the trial court's opinion justifies the ruling by explaining, in part, that it was permitted to exclude "[Jordan]'s intimidating family members." Trial Court Opinion, 8/29/18, at 11. We agree. However, we cannot accept this passing reference as including his mother and stepfather, and the opinion does not suggest that the mother and stepfather were part of

unreasonably failed to consider that reasonable alternative to total closure which cannot be upheld under **Waller** and **Presley**.

## D.

All that is left is the remedy. The violation of the right to a public trial constitutes a structural defect, a specific type of constitutional error warranting a new trial without any showing of prejudice. **See Commonwealth v. Sandusky**, 77 A.3d 663, 671 (Pa. Super. 2013) ("Structural defects defy analysis by harmless-error standards because they affect the framework within which the trial proceeds, and are not simply an error in the trial process itself.") (quotation marks and citation omitted). Violation of the right to a public trial constitutes structural error. **See Neder v. United States**, 527 U.S. 1, 8 (1999) (citing **Waller**). Structural errors "will always invalidate the conviction." **Sullivan v. Louisiana**, 508 U.S. 275, 279 (1993) (citations omitted). In this case, Jordan's family members were excluded from jury selection after a request was made that they be allowed

---

the group. Notably, the trial court did not disagree with Jordan's representation that those two were not part of the disturbance. Moreover, the trial court said, "I don't know who belonged to who, but they were here with respect to Mr. King and Mr. Jordan." N.T., 10/13/16, at 4.

Again, we accept that the trial court was permitted to exclude the public at large based on the large scale disruption. And we do not suggest that the trial court was obligated to personally examine each person among the large group before ejecting them. The court was, however, obligated to explain why Jordan's mother and stepfather, who are not "regular" members of the public vis-à-vis Jordan, were properly excluded when presented with that reasonable alternative to total closure.

- 24 -

to attend and no reason was given by trial court for their exclusion.  That is a structural error warranting a new trial without any finding of prejudice.  ***See Presley***; ***Weaver***.

Judgment of sentence vacated.  Case remanded for new trial.  Jurisdiction relinquished.

Judge Lazarus joins the opinion.

Judge Nichols files a concurring opinion in which Judge Lazarus joins.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/29/19