J-A28018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| LATEEFAH PERRY | |
| Appellee | No. 2443 EDA 2018 |

Appeal from the Order entered July 17, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0001940-2017

BEFORE:  PANELLA, P.J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.                    **FILED APRIL 28, 2020**

The Commonwealth appeals from the July 17, 2018 order granting judgment of acquittal in favor of Appellee Lateefah Perry on the charge of conspiracy to commit aggravated assault, 18 Pa.C.S.A. § 903.  We vacate the July 17, 2018 order and remand for reinstatement of the April 11, 2018 sentence on this charge.

The record reflects that on the evening of January 23, 2017, Malika Adamson (complainant/victim), Appellee (whom Adamson considered her "step-sister"), and Appellee's friend Chantey attended a party at Iddin Williams' house at 4513 North 13th Street in Philadelphia.  Dion Kornegay, who was Appellee's boyfriend, and his brother Beano were also at the party.  During the party, Adamson got into an argument with Beano, and a fight

_____

[*] Former Senior Judge assigned to the Superior Court.

ensued. Kornegay and Appellee broke up the fight. N.T., 12/5/17, at 36, 52-56.

Adamson left the house and called the police. Appellee and Chantey followed Adamson to try to calm her down, and the three sat in a car outside the house. A police officer responded to the call but made no arrests because Adamson refused to provide the names of any combatant. Appellee drove Adamson home. *Id.* at 36, 52-56.

Adamson initially did not realize the extent of her injuries, but she woke up the next morning to find her left eye swollen nearly shut, her face covered in bruises, her lip gashed, and her body sore. She called for an ambulance, which transported her to a local hospital, and she received treatment for a broken nose. *Id.* at 56-57, 60-62.

The fight and Adamson's injuries sparked a series of heated cellphone conversations and text messages over the next few days between Adamson, Kornegay, Iddin and Appellee. Adamson made clear to Kornegay that she wanted to contact the police to get his brother Beano prosecuted for assaulting her. Kornegay attempted to talk Adamson out of contacting law enforcement and attempted to convince her that she should settle her dispute with Beano as they would on the streets: by fighting someone they chose for her to fight or arranging for someone to fight Beano on her behalf. Adamson refused. Adamson was upset with Appellee, whom she felt was taking Kornegay's side rather than hers. *Id.* at 62-64, 160-61.

Throughout the day on January 26, 2017, Kornegay and Adamson communicated by phone between five and ten times. Kornegay called the victim and told her that he had someone for her to fight. The victim advised him that she was not going to fight, and that she was going to get his brother locked up. Kornegay told her not to go anywhere and that he was on his way to her house. *Id.* at 63-67, 138, 153.

At approximately 7:15 p.m. on January 26, 2017, Adamson had just brought her four- and six-year-old children inside her home at 3027 West Gordon Street. She was standing outside talking to Chantey on the phone when she looked down her block toward 30th Street and saw Kornegay, Iddin, Iddin's brother Si and an unknown woman walking in her direction. Kornegay screamed something, and Adamson turned to run back into her house. Kornegay and the others began running and chasing her as she attempted to get inside. Before she could close and lock her door, Kornegay and the others reached her door and tried to push it open. Adamson's brother, Rakeem, joined Adamson in resisting the intruders. Outnumbered, and with Kornegay's hand extended through the doorway, Adamson was unable to close the door, so she struck Kornegay's hand with a brick lying by the door. Kornegay retracted his hand, and Adamson and Rakeem closed and locked the door. Adamson immediately called the police. *Id.* at 69-73, 148, 153-54.

Adamson opened the door and saw Kornegay and the others walking back toward 30th Street. Adamson saw Appellee near 30th Street in the

driver's seat of Appellee's car, a black Toyota Corolla. Adamson proceeded outside as Iddin, Si, and the unknown woman were entering the passenger seats of the car, and she yelled at the group not to leave because she had called the police. As Kornegay neared the car, he spun around, brandished a pistol from his pocket, and fired several shots toward Adamson. She dove behind her steps before crawling inside her front door. When the shooting stopped, she peeked out of her front window and saw Appellee's car driving in reverse along Gordon Street toward 29th Street. *Id.* at 104, 131, 150, 154.

Detective James Dunlap obtained the cellphone records for Appellee's mobile phone and analyzed the historical cell site data from the time of the incident. During the group attack on the victim, and the minutes immediately preceding and following the attack, Appellee's cellphone was within an approximately one-square-mile, circular area that included the crime scene. This geographical area excluded Appellee's registered address, Kornegay's registered address, and the address at which Appellee and Kornegay had been living at the time of the crime. Detective Dunlap further limited the cellphone's location to the southwest portion of the circular area, which included the crime scene, by determining that the phone was transmitting data to the southwest panel of the cell tower. Appellee's registered address and place of residence at the time of the crime were northeast of the cell tower, approximately one and a half miles east of the crime scene. *Id.* at 158, 199-200; N.T. 12/6/17, at 48-49, 57, 59.

On December 8, 2017, a jury found Appellee guilty of conspiracy to commit aggravated assault. On April 11, 2018, Appellee was sentenced to eleven and one-half to twenty-three months of incarceration, followed by one year of probation, with immediate parole. On April 18, 2018, Appellee filed timely post-sentence motions seeking "extraordinary relief," *i.e.*, judgment of acquittal. On July 17, 2018, the trial court granted Appellee's motion and entered judgment of acquittal. The Commonwealth filed a timely appeal to this Court, and both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

The trial court stated in Rule 1925 opinion:

Viewed in the light most favorable to the Commonwealth as verdict winner, the circumstances of this case do not establish that [Appellee] conspired to commit an assault on the complainant. First, the complainant testified that although she recognized the car as belonging to [Appellee], she never saw her that evening. The complainant further stated there did not appear to be anyone inside of the car. However, even if [Appellee] was present inside of her car, the evidence was insufficient to show that she was aware of Mr. Kornegay's criminal intent. **See Commonwealth v. Swerdlow**, 636 A.2d 1173, 1177 (Pa. Super. 1994) (finding that mere presence is insufficient to establish a conspiracy "unless the [Appellee] had prior knowledge of his alleged co-conspirator's criminal intent"). Second, the Commonwealth presented no evidence that [Appellee] knew Mr. Kornegay was in possession of a weapon, let alone that he would use it to assault the complainant. After Mr. Kornegay and the three other individuals were walking away from the complainant's home and in the direction of the car, the complainant walked into the middle of the street and yelled after them. It was at this moment that Mr. Kornegay turned around and spontaneously began shooting at the complainant. Third, the surrounding circumstances leading up to the incident on January 26th do not lend support to the Commonwealth's argument that [Appellee] shared a criminal intent to assault the complainant. On January 24th, following the

complainant's physical altercation with Mr. Kornegay's brother, it was [Appellee] who tried to calm her God-sister down and then drove her home. That [Appellee] and Mr. Kornegay were in a relationship at the time is similarly insufficient by itself to establish that an agreement was formed. **See Commonwealth v. Chambers**, 188 A.3d 400, 410 (Pa. 2018) ("No level of intimacy or history between actors can replace the elements of the offense."). The circumstantial evidence presented by the Commonwealth did not suffice to establish beyond a reasonable doubt that [Appellee] conspired to commit an assault against the complainant.

Trial Court Opinion, 4/26/19, at 5-6.

The Commonwealth raises a single issue in this appeal:

Was the lower court's order granting [Appellee]'s post-sentence motion for a judgment of acquittal for conspiracy to commit aggravated assault erroneous, where the evidence showed that [Appellee] drove four people to and from the home of the already-injured victim where they attempted to assault her as a group, even before one of the conspirators pulled out and fired a gun?

Commonwealth's Brief at 4.

A post-sentence motion for judgment of acquittal "challenge[s] the sufficiency of the evidence to sustain a conviction" for the offense charged. Pa.R.Crim.P. 606(A)(6). When reviewing a sufficiency challenge,

an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt. It [is] incumbent upon the Superior Court to consider all of the evidence introduced at the time of trial, and apparently believed by the fact finder, including the expert's testimony. In applying this standard, [the reviewing court must] bear in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's ruling thereon were correct; and the trier of fact, while passing upon the credibility of witnesses

and the weight of the proof, is free to believe all, part, or none of the evidence.

***Commonwealth v. Ratsamy***, 934 A.2d 1233, 1237 (Pa. 2007). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013).

A person commits criminal conspiracy if (1) she intends "to commit or aid in the commission" of a crime; (2) she enters "into an agreement with another [a 'co-conspirator'] to engage in the crime;" and (3) she "or one or more of the other co-conspirators" commits an overt act in furtherance of their agreement. ***Commonwealth v. Le***, 208 A.3d 960, 969 (Pa. 2019). Because direct evidence of criminal intent and conspiratorial agreement is rarely available, these elements are generally proven through circumstantial evidence, such as "the relations, conduct[,] or circumstances of the parties, or overt acts on the part of co-conspirators." ***Id.*** Among the circumstances that are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. ***Commonwealth v. Jordan***, 212 A.3d 91, 97 (Pa. Super. 2019). "While such circumstances are insufficient standing alone, they may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which

they occurred." ***Commonwealth v. Carter***, 416 A.2d 523, 524 (Pa. Super. 1979) (internal quotations omitted).

"Other circumstances which are relevant include post-crime conduct, such as flight, because it tends to establish consciousness of guilt. When combined with other direct or circumstantial evidence, that conduct may provide sufficient evidence to establish a conspiracy." ***Jordan***, 212 A.3d at 97. Cases examining conspiracies in situations involving getaway drivers

> often emphasize post-crime conduct as illustrative of intent. ***See Commonwealth v. Brown***, [], 505 A.2d 295, 297 ([Pa. Super.] 1986) ("A jury could find that appellant's presence outside the Johnson home, where he had no cause to be, sitting behind the wheel of a car, which he then used to transport the stolen Johnson television set and the thief away from the scene of the crime, was not merely fortuitous."); ***Commonwealth v. Azim***, [] 459 A.2d 1244 ([Pa. Super.] 1983) (*per curiam*) ("Conspiracy to commit burglary has been found where the defendant drove codefendants to the scene of a crime and then later picked them up.") (citation omitted); ***Commonwealth v. Esposito***, [] 344 A.2d 655, 656 ([Pa. Super.] 1975) ("She was the driver and custodian of the getaway car, on whose person the police found some remnants of the day's booty. While it is true that there was no direct evidence of an unlawful agreement, such an agreement can readily be inferred from appellant's conduct.").

***Id.*** at 98.

Notably, "individuals can conspire to commit a crime—to rob a bank for instance—but abandon the cause or be thwarted prior to completion and still be guilty of conspiracy. All that is required for a conspiracy is an agreement to commit a crime and an overt act in furtherance of the agreement or plan." ***Commonwealth v. Vining***, 744 A.2d 310, 316 (Pa. Super. 1999).

Appellee was charged with conspiracy to commit aggravated assault. A person commits aggravated assault if she "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1). Since commission of the underlying crime is not an element of criminal conspiracy, a conspirator may be convicted of conspiracy to commit aggravated assault even if the conspirators are unsuccessful in committing the assault. *Commonwealth v. Thomas*, 65 A.3d 939, 944 (Pa. Super. 2013). Similarly, "the crime ultimately accomplished does not retroactively limit the scope of the original conspiracy." *Id.* Whether the victim "actually suffered serious bodily harm is [therefore] irrelevant" where the conspirators intended to inflict such an injury. *Commonwealth v. Caterino*, 678 A.2d 389, 391 (Pa. Super. 1996).

The Commonwealth argues that Appellee conspired with Kornegay, Iddin, Si, and an unidentified female to assault Adamson **physically** for threatening to report Beano to the police.[1] Appellee participated in this conspiracy, the Commonwealth continues, by agreeing to drive the others to and from Adamson's house. The record supports this argument.

_____

[1] The Commonwealth all but admits that Appellee did not conspire with Kornegay to shoot at Adamson. Commonwealth's Brief at 10, 21 (Kornegay's decision to shoot at Adamson was "conceivably spontaneous").

Multiple pieces of evidence, viewed collectively, establish Appellee's intent to participate in, and agreement to enter, the conspiracy to assault Appellee physically: (1) Appellee's relationship as Kornegay's girlfriend, (2) Appellee's knowledge that Kornegay's brother, Beano, had injured Adamson in a fight on January 23, 2017, (3) Appellee's knowledge that Kornegay was attempting to convince Adamson not to call the police and to settle her dispute with Beano through other means, such as a fight with another person, (4) Appellee's support for Kornegay's proposal, (5) the fact that Appellee drove Kornegay, Iddin, Si, and an unidentified female to Adamson's house on January 26, 2017 and waited for them in her car, (6) the four individuals' attempt to break into Adamson's house forcibly, (7) the individuals' retreat to Appellee's car after Adamson and her brother fought them off, (8) Adamson's demand during their retreat that they wait for the police, and (9) Appellee's flight from the scene in her car with the other individuals. While each fact is insufficient standing alone, the body of circumstantial facts, "viewed in conjunction . . . and in the context in which they occurred," **Carter**, 416 A.2d at 524, links Appellee to the conspiracy by proving her association with other conspirators, her knowledge of their plan to assault Adamson, her presence at the scene of the crime, and her flight from the scene. In addition, Appellee committed overt acts in furtherance of the conspiracy by driving her cohorts to Adamson's house and fleeing with them from the scene. The other four individuals committed overt acts by attempting to break into Adamson's house

forcibly. The fact that the plan to attack Adamson failed does not absolve Appellee from conspiring to harm Adamson. *Vining*, 744 A.2d at 316. For these reasons, the Commonwealth proved each element of the crime of conspiracy.

The trial court failed to construe the evidence in the light most favorable to the Commonwealth, as the law required it to do. According to the trial court, Adamson testified that she never saw Appellee on the evening in question, and nobody appeared to be inside the car. Trial Ct. Op. at 5. The Commonwealth, however, introduced Adamson's signed statement to detectives that evening in which she identified Appellee as the getaway driver in a car that Appellee owned. Moreover, Appellee's cellphone data showed that she was within one square mile of the crime scene and outside the area encompassing her registered address, Kornegay's registered address, and the address at which Appellee and Kornegay had been living at the time of the crime. Viewed in the light most favorable to the Commonwealth, this evidence demonstrates that Adamson saw Appellee in her car.

The trial court also contends there was no evidence that Appellee knew Kornegay possessed a weapon or intended to use it against Adamson. The court misperceives the nature of the conspiracy. As discussed above, the Commonwealth virtually concedes that Appellee did not conspire to shoot Adamson. Conversely, the evidence demonstrates that Appellee conspired to attack Adamson physically. The lack of a conspiracy to shoot Adamson does

- 11 -

not negate Appellee's culpability for participating in the conspiracy to attack Adamson physically.

Next, the trial court maintains that the "surrounding circumstances" do not establish Appellee's intent to enter a conspiracy, because (1) "on January 24th, following the complainant's physical altercation with [] Kornegay's brother, it was [Appellee] who tried to calm her God-sister down and then drove her home," and (2) "[the fact] that [Appellee] and [] Kornegay were in a relationship at the time is similarly insufficient by itself to establish that an agreement was formed." Trial Ct. Op. at 5. The court erred by viewing these strands of evidence in isolation instead of viewing the entire body of evidence in the light most favorable to the Commonwealth. Although Appellee helped calm Adamson down and drove her home, other evidence demonstrates that she later joined the conspiracy, such as her support for Kornegay's position concerning Beano and the fact that she drove the four other individuals to Adamson's house and served as the getaway driver from the scene. **Jordan**, 212 A.3d at 98. This conduct, in conjunction with the fact that Appellee was Kornegay's girlfriend, furnished sufficient proof of her participation in the conspiracy.

For these reasons, the trial court erred by granting Appellee's post-sentence motion for judgment of acquittal. We therefore vacate the order granting judgment of acquittal and remand for reinstatement of Appellee's judgment of sentence for conspiracy to commit aggravated assault.

Order vacated. Case remanded for reinstatement of guilty judgment and sentence. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/28/2020