J-A27013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RONNIE ROBINSON | |
| Appellant | No. 230 EDA 2019 |

Appeal from the Judgment of Sentence Entered December 18, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0011146-2013

BEFORE:  STABILE, NICHOLS, and COLINS, JJ.

MEMORANDUM BY STABILE, J.:　　　　　　　　**FILED:  MARCH 19, 2021**

Appellant Ronnie Robinson[1] appeals from the December 18, 2018 judgment of sentence[2] entered in the Court of Common Pleas of Philadelphia County ("trial court"), following his jury convictions for second-degree murder, robbery, burglary, and conspiracy to commit robbery.[3]  Upon review, we affirm.

---

[1] Appellant also is known as "Lonnie Robinson," but for purposes of this appeal we shall refer to him only as "Ronnie Robinson".

[2] Appellant filed his notice of appeal to this Court from the denial of post-sentence motions on December 27, 2018.  Notice of Appeal, 1/18/19.  In a criminal action, however, the appeal properly lies from the judgment of sentence made final by the denial of timely post-sentence motions. ***Commonwealth v. Kuykendall***, 2 A.3d 559, 560 n.1 (Pa. Super. 2010).  We have amended the caption accordingly.

[3] 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), 3502(c)(1), and 903, respectively.

The facts and procedural history of this case are undisputed. In connection with the May 11, 2013 late-night killing of Thomas Watson (the "victim"), Appellant was charged with the foregoing crimes. On January 15, 2018, Appellant filed a motion to suppress, alleging, among other things, that the police did not apprise him of his **Miranda**[4] rights prior to obtaining his statement. Appellant argued that "any statements obtained from [him] were neither knowing, voluntary nor authentic," in violation of his constitutional rights, and as a result, needed to be suppressed. Motion to Suppress, 1/15/18, at ¶¶ 12-13. Following a hearing, the trial court denied Appellant's suppression motion on February 1, 2018.

Appellant, along with his three co-defendants, proceeded to a multi-day jury trial, at which the Commonwealth presented the testimony of countless witnesses. The following facts were adduced at trial. The victim lived above a Häagen-Dazs ice cream store at 242 South Street in Philadelphia. He worked across town as a disc jockey ("DJ") at the Copabanana Club at 40th and Spruce Streets. At about 2:00 a.m. on May 11, 2013, after finishing work at the Copabanana, the victim texted James Weisbrod, who drove an unlicensed cab in Philadelphia, and asked Weisbrod for a ride. Weisbrod picked up the victim and Appellant, who worked as a security guard at the Copabanana. Weisbrod drove Appellant to an address in North Philadelphia. Weisbrod and

_____

[4] **Miranda v. Arizona**, 384 U.S. 436 (1966).

- 2 -

the victim then stopped at a restaurant before driving to the victim's apartment. N.T. Trial, 10/10/18, at 94-97.

Weisbrod parked his burgundy Lincoln Town Car on American Street and then helped the victim to unload his DJ equipment outside his apartment. The victim entered the closed Häagen-Dazs store, through which he had to walk to get to his second-floor apartment. As Weisbrod was about to leave the area, he noticed that the victim had not moved his DJ equipment, which was still outside in the rain. Concerned, he returned to South Street and opened the door to the Häagen-Dazs store. Co-defendant Clarence Pone blocked Weisbrod's path and told him, "Get the fuck out of here." *Id.* at 95-98, 101-02. Weisbrod got into his vehicle, but instead of leaving the area, he circled the block and parked his car in front of the Häagen-Dazs store. When he heard two gunshots, Weisbrod got out of his car and walked into the store. As he entered, co-defendant Josephe Murray left the store. Weisbrod saw the victim lying on the ground behind the counter and called 911. *Id.* at 102-04.

At approximately 3:00 a.m., Philadelphia Police Officers Corson and Duffy were on patrol when they received a radio call for a robbery in progress at the Häagen-Dazs store. The officers entered the store and discovered the victim's body behind the ice cream counter. Officer Corson observed wounds to the victim's chest and head. While on the premises, the officers noticed signs of a struggle and heard a cell phone ringing, but they could not locate the phone. *Id.* at 75-79; N.T. Trial, 10/11/18, at 25-28.

- 3 -

Philadelphia Police Officer Coleman also heard the radio call for the Häagen-Dazs store robbery and learned that the suspects were last seen running down American Street wearing dark clothing. As he drove north on American Street, he noticed a discarded black hoodie and glove lying on the sidewalk. Officer Coleman covered the items with a heavy paper bag to protect them from the elements and turned them over to a crime scene investigator. Forensic testing later demonstrated that the victim's DNA was on the upper back portion of the hoodie. N.T. Trial, 10/11/18, at 53, 65, 68; N.T. Trial, 10/22/18, at 208.

Police officers reviewed camera footage from inside and outside the Häagen-Dazs store depicting the final moments of the victim's life. The video showed that one hour before the murder, two vehicles, a Honda and a green Ford Explorer, parked along the 200 block of South Street, where the drivers and occupants waited until Weisbrod and the victim arrived in Weisbrod's vehicle. As the victim entered the store, two men followed him inside and one produced a large handgun. The victim struggled with the two men, who kicked and beat him with the handgun. The video showed that Weisbrod attempted to enter the store but was stopped by an individual blocking his path. The victim was then shot. Weisbrod returned to the store, where a man with a bloodstained hoodie ran passed him in the doorway and ran down the street. N.T. Trial, 10/11/18, at 159; N.T. Trial, 10/15/18, at 162-63, 168-79.

On May 12, 2013, one day after the shooting, Detective John Harkins recovered a Samsung TracFone (a pre-paid cellphone) from inside the store

that had fallen underneath an ice cream machine. The officers submitted an exigent circumstances request for information to T-Mobile and learned that the phone had been shipped to a woman named Carmen Melton, who lived at 5718 Reedland Street. The officers reviewed the call logs to see if they could learn any information about the identities of individuals attempting to contact the phone. One telephone number was associated with a woman named Cheneka Jones, who lived at 5706 Reedland Street. The officers used a search database to determine who else was associated with that address. They saw a photo of co-defendant Murray and realized that he was one of the individuals in the video camera footage inside the Häagen-Dazs store. Detective Joseph Bamberski assembled a photo array that included co-defendant Murray's photograph and showed it to Weisbrod, who positively identified Murray as the individual who had come to the door of the Häagen-Dazs store at the time of the shooting. N.T. Trial, 10/10/18, at 112, 116; N.T. Trial, 10/11/18, at 161-62; N.T. Trial, 10/15/18, at 81-87; N.T. Trial, 10/22/18, at 47.

On May 12, 2013, Detective Theodore Hagan interviewed Appellant, as he was the man who rode with the victim in Weisbrod's vehicle. At that time, Appellant was not a suspect. Appellant told the detective that he had left the Copabanana Club after work with the victim. Appellant further stated that the victim had invited him to come over to his "crib" that night but that he declined the invitation and got a ride home instead. Appellant was dropped off at his house in North Philadelphia at approximately 2:45 a.m. According to Appellant, the victim sold drugs. Appellant also told Detective Hagan that the

victim had been in a fight with someone on South Street. N.T. Trial, 10/15/18, at 42-63.

Meanwhile, detectives continued to examine call records from co-defendant Murray's cell phone and learned that he had been in communication sixteen times on the night of the murder with a phone registered to co-defendant Larry Nelson. N.T. Trial, 10/15/18, at 89.

Detective Bamberski prepared warrants to arrest Murray and search his residence at 5706 Reedland Street. On the morning of May 15, 2013, Murray was arrested at his home. Police officers recovered a pair of camouflage shorts that looked like the ones worn by the shooter in the video and proof of residency from the house. *Id.* at 90-92.

After receiving *Miranda* warnings, co-defendant Murray gave an inculpatory statement to Detective Bamberski (redacted for trial) in which he admitted shooting and killing the victim.[5] Murray explained that he owed a guy $5,000 for marijuana, so he agreed to rob the victim, who was known to have drugs in his apartment. Murray and another person waited for the victim to arrive at the Häagen-Dazs store. When Weisbrod dropped the victim off at the store, Murray and another man ran to the store, grabbed the victim, and dragged him to the back of the store. Weisbrod returned to the store, but the other guy (co-defendant Pone) prevented him from entering the premises. Murray, who was alone with the victim, hit him with his gun. Murray asked

_____

[5] As discussed *infra*, Pone's trial testimony allowed the Commonwealth to connect all co-defendants to the victim's murder.

him where the drugs were, but the victim continued to argue with him. Murray got a call from Nelson and was instructed to kill the victim. Murray shot him in the head, ran out of the store, and discarded his hoodie and glove while he fled. He later met two of the other guys on 57th Street near Angora Terrace and returned the gun to one of the men. He also said that at the time of the shooting, he was using a TracFone he had purchased on the street. *Id.* at 98-119.

On the same day that Murray was arrested, Detective Francis Graf picked up Appellant at his home because Murray had implicated him in the murder. Detective Graf told Appellant that the police had more questions for him, and brought him to the Homicide Division. After reading him the *Miranda* rights, the police obtained Appellant's confession. Specifically, Appellant gave a statement (redacted for trial) in which he said that he met the victim, when they both worked together at the Copabanana Club. Appellant provided security for the victim and also picked up and dropped off money and drugs for him. Appellant stated that he knew the individual who was responsible for having the victim shot and killed. This individual (co-defendant Nelson) came to the club on the night of the shooting and told Appellant that the victim "was sitting" on a lot of money and drugs and "[they were] going to get that tonight." Nelson instructed Appellant to call him to let him know when the victim would be getting home. Appellant also admitted that he knew Nelson planned to rob the victim because he had talked about doing it before in March. Appellant claimed that he told Nelson he did not

want anything to do with the plan. Nelson, however, told Appellant that he would "take care of him" by paying Appellant for calling him to tell him when the victim "would be home." N.T. Trial, 10/23/18, at 23, 25, 40-43. Appellant further stated that on the night the victim was killed, he left Copabanana with the victim in a cab. After the cab dropped him off, Appellant received a call from Nelson and told him that the victim was on his way home in a dark-colored Lincoln. The next day, Appellant read on Facebook that the victim had been killed. *Id.* at 43-44.

Co-defendant Nelson also was arrested on May 15, 2013. Philadelphia Police Officer Hindley was instructed to look for Nelson in the area of the 5400 block of Angora Terrace. Officer Hindley noticed Nelson's 1997 Ford Explorer parked in the neighborhood, a vehicle that looked the same as one seen waiting outside the store on the surveillance video. Officer Hindley saw Nelson approach the vehicle and placed Nelson under arrest. Inside the car, police officers found Nelson's license and registration, as well as binoculars, black gloves and a box of ammunition. Nelson's phone had information relating to defendant's arrest and a news report of the victim's homicide. N.T. Trial, 10/22/18, at 6, 9-12, 26, 33-35; N.T. Trial, 10/23/18, at 112-19. On the morning of May 16, 2013, Nelson gave an inculpatory statement to Detective John Harkins. Nelson claimed that another guy had planned the robbery, and that his role was limited to introducing some of the participants to each other and acting as a lookout. Nelson called someone to tell him the victim was on

his way home and he stated that he also was supposed to notify the other guy when the robbery was complete. N.T. Trial, 10/22/18, at 57, 64-65.

On May 16, 2013, as detectives learned more about the shooting, they prepared a photographic array that included a photo of co-defendant Pone and showed the array to Weisbrod. Weisbrod identified Pone as one of the two men he saw at the Häagen-Dazs store, and Detective Bamberski obtained an arrest warrant and warrant to search Pone's residence at 5622 Angora Terrace. The search warrant was executed on May 17, 2013. Inside Pone's house, police recovered a red Nike hat that resembled the hat worn by one of the men on the video, and proof of residence for Pone. N.T. Trial, 10/15/18, at 137-41. Pone was arrested several days later, on June 4, 2013. He, too, gave an inculpatory statement admitting to his involvement in the killing of the victim. According to Pone, he was approached a few days before the shooting by a man (Nelson)[6] who asked him if he wanted to make some quick cash. When Pone said that he did, the man told him to rough up the victim and take his money. A few nights later, the man picked up Pone and told him the plan was to go to the victim's house and steal his money and drugs. Pone said he and a few other men went to South Street and waited there until the victim arrived. Pone and another man (Murray) went into the store, fought with the victim, and dragged him to the back of the store. The other guy (Murray) pulled out a gun and they both roughed the victim up a bit. Pone

_____

[6] **See** N.T. Trial, 10/24/18, at 134-40.

then saw the victim's cab driver return to Häagen-Dazs, so he intercepted him at the front door and prevented him from entering the store. Pone told the man to "get the fuck out of here" and followed him outside. Pone then went home. *Id.* at 143-55. At trial, although Pone admitted to beating the victim, he denied being part of any conspiracy. The Commonwealth, however, impeached him with his statement to police,[7] in which Pone had discussed how the security guard (Appellant) at the Copa had been involved in the robbery plot and had told Nelson "what the victim had," which was why Nelson "set up the plan to take the [victim's] stuff." N.T. Trial, 10/24/18, at 157-58.

On October 26, 2018, the jury found Appellant guilty of second-degree murder, robbery, burglary, and conspiracy to commit robbery. On December 18, 2018, the trial court sentenced Appellant to life imprisonment without the possibility of parole. Appellant moved for post-sentence relief, challenging the weight of the evidence underlying his convictions. On December 27, 2018, the trial court denied his post-sentence motion. Appellant timely appealed. The trial court did not instruct Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal and did not file an opinion under Pa.R.A.P. 1925(a), because, as the docket indicates, the trial judge retired in early 2019.

On appeal, Appellant presents three issues for our review.

---

[7] Pone's testimony was admissible against Appellant and other co-defendants, because Pone made himself available for cross-examination. N.T. Trial, 10/25/18, at 5. In contrast, only redacted versions of the statements by Appellant, Murray and Nelson were read to the jury.

I.  Whether the court erred when it denied Appellant's suppression motion where Appellant was subjected to a custodial interrogation while deprived of his pain medication and where he did not fully acknowledge that he understood his **Miranda** warnings?

II. Whether Appellant's convictions were against the weight of the evidence and shocking to one's sense of justice where there was no physical evidence, no scientific evidence, no cell phone evidence, no images, no flight or concealment and where the alleged inculpatory statement of Appellant was not voluntary, knowing or authentic when Appellant was deprived of his pain medication and where Appellant did not fully acknowledge that he understood his **Miranda** warnings?

III. Whether Appellant's convictions were based upon insufficient evidence that he engaged in a conspiracy or that he was an accomplice where the Commonwealth did not prove anything more than that Appellant told Larry Nelson that the victim was driving home?

Appellant's Brief at 6 (unnecessary capitalizations and direct articles omitted).

We address Appellant's claims *seriatim*. He first argues that the trial court erred in failing to suppress his May 15, 2013 statement to the police because he did not waive his right against self-incrimination knowingly or voluntarily. In support, he points out that the police deprived him of his pain medication prescribed for his skin infection. ***Id.*** at 18.

In reviewing appeals from an order denying suppression, our standard of review is limited to determining

> whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.

> When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Griffin*, 116 A.3d 1139, 1142 (Pa. Super. 2015). Our scope of review is limited to the evidence presented at the suppression hearing. *In re interests of L.J.*, 79 A.3d 1073, 1088-89 (Pa. 2013).

Generally, statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of his *Miranda* rights.[8] *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa. Super. 2001), *appeal denied*, 806 A.2d 858 (Pa. 2002). Under *Miranda*, police officers are required to apprise suspects prior to questioning that they have the right to remain silent, that any statement made may be used against them, and that they have the right to an attorney. *Miranda*, 384 U.S. at 444. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* As our Supreme Court explained in *Commonwealth v. Mitchell*, 902 A.2d 430 (Pa. 2006), *cert. denied*, 549 U.S. 1169 (2007):

> The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review. Moreover, the totality of the circumstances must be considered in evaluating the voluntariness of a confession. The determination of whether a defendant has validly waived his *Miranda* rights depends upon a two-prong analysis: (1) whether the waiver was voluntary, in the sense that defendant's choice was not the end result of governmental pressure, and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full

---

[8] It is undisputed that a custodial interrogation occurred in the case *sub judice*.

- 12 -

comprehension of both the nature of the right being abandoned and the consequence of that choice.

*Mitchell*, 902 A.2d at 451 (citations omitted). "Only if the 'totality of the circumstances surrounding the interrogation' reveals **both** an uncoerced choice **and** the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Commonwealth v. Cephas*, 522 A.2d 63, 65 (Pa. Super. 1987) (emphasis added), *appeal denied*, 531 A.2d 1118 (Pa. 1987), *cert denied*, 484 U.S. 981 (1987). To assess voluntariness, a court should look at the following factors: (1) the duration and means of the interrogation; (2) the physical and psychological state of the accused; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) any and all other factors which could drain a person's ability to withstand suggestion and coercion. *See Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998). The Commonwealth bears the burden of proof "by a preponderance of the evidence that the waiver is voluntary, knowing, and intelligent." *Id.* To establish that, "the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." *Commonwealth v. Eichinger*, 915 A.2d 1122, 1136 (Pa. 2007), *cert. denied*, 552 U.S. 894 (2007).

Instantly, based upon our review of the suppression transcript, we conclude that the trial court did not err in denying Appellant's suppression motion. *Miranda* warnings were read to Appellant and at no point did he complain of any pain or that pain medication impaired his ability to understand

his constitutional rights. At the suppression hearing, Detective Graf—assigned to the Homicide Unit—testified that on May 15, 2013 he drove an unmarked police vehicle to Appellant's residence where he picked him up. N.T. Suppression, 2/1/18, at 31. Detective Graf testified that the reason he picked up Appellant was that Murray had implicated Appellant in the victim's killing. *Id.* Upon arriving at Appellant's home, Detective Graf informed him that the police had "additional questions for him." *Id.* at 31-32. According to Detective Graf, Appellant came with him voluntarily. *Id.* at 32. At this point, Appellant was neither arrested nor handcuffed. *Id.* Detective Graf recalled that, en route to the Homicide Unit, Appellant discussed his skin infection, which was contagious in nature. *Id.* at 33. Once they reached the Homicide Unit, Appellant initially was seated in a reception area. *Id.* No handcuffs were employed. *Id.* at 34. Eventually, Appellant was taken to an interview room, where the detectives apprised him of his right against self-incrimination. *Id.* at 34-37. Appellant also initialed a written waiver of rights. *Id.* at 37.

> Question No. 1: Do you understand that you have a right to keep quiet and do not have to say anything at all?
>
> Answer: Yes. L.R.[9]
>
> Question: Do you understand that anything that you say can and will be used against you?
>
> Answer: Yes. L.R.
>
> Question 3: Do you want to remain silent?

---

[9] As noted earlier, Appellant also is known as Lonnie Robinson. His initials therefore are L.R.

Answer: No. L.R.

Question 4: **Do you understand** that you have a right to talk with a lawyer before we ask you any questions?

Answer: Yes. L.R.

Question No. 5: Do you understand that if you cannot afford to hire a lawyer and you want one, we will not ask you any questions until a lawyer is appointed for you free of charge?

Answer: Yes. L.R.

Question No. 6: Do you want to talk with a lawyer at this time or to have a lawyer with you while we ask you questions?

Answer: No. L.R.

Question No. 7: Are you willing to answer questions of your own free will without force or fear and without any threats or promises having been made to you?

Answer: Yes. L.R.

*Id.* at 41-42 (emphasis added) (sic). Detective Graf testified that, during Appellant's time at the Homicide Unit, if Appellant had so desired, he would have been afforded an opportunity to access food or a bathroom. *Id.* at 43. Detective Graf also testified that Appellant was not threatened, either physically or verbally, and that no promises were made to him. *Id.* at 59. Detective Graf recalled that Appellant did not appear to be under the influence of drugs or alcohol and had no difficulty responding appropriately to questions. *Id.* at 78-79. In his ensuing statement, Appellant informed the detectives that "I am taking medication for MRSA, but I don't know the names of any of them." *Id.* at 46. When asked whether "any of the medication that you are taking [is] preventing you from understanding and answering the questions

that are being asked of you," Appellant responded "No." *Id.* Appellant spent less than four hours at the Homicide Unit, from the time he arrived until he finished giving his statement. *Id.* at 39, 59.

Thus, given the foregoing, and considering the totality of the circumstances here, we conclude that the trial court did not err in denying Appellant's motion to suppress inculpatory statements that he made on May 15, 2013. There are no indications that Appellant did not understand fully the *Miranda* rights to render his waiver of them constitutionally infirm or that he otherwise was coerced, threatened or coerced into relinquishing the same. Although the record plainly indicates that Appellant suffered from a skin infection, it did not affect his cognitive abilities or comprehension. Indeed, Appellant affirmatively stated so. *See e.g. Commonwealth v. Poplawski*, 130 A.3d 697, 711-12 (Pa. 2015) (noting that the confession was voluntary although the appellant was in the hospital suffering from a gunshot wound); *Commonwealth v. Walker*, 656 A.2d 90, 97-98 (Pa. 1995) (confession was voluntary even though the appellant told police he had consumed peroxide, cut his wrist, and swallowed twenty pills).[10]

Appellant also points to a subsequent portion of his May 15, 2013 statement to support his contention that he did not understand the *Miranda*

---

[10] *Cf. Commonwealth v. Logan*, 549 A.2d 531, 537 (Pa. 1988) (stating that defendants with psychological problems are indeed able to make a valid waiver of their *Miranda* rights); *accord Commonwealth v. Bracey*, 461 A.2d 775, 790 n.7 (Pa. 1983) (finding that a defendant who was prone to hallucinations could make a valid waiver of her constitutional rights).

warning.  Appellant's Brief at 18.  Appellant claims that when he was asked "[e]arlier do you **understand** me reading over your constitutional warnings with you?" he crossed out the word "understand" and replaced it with "**remember**."  We, however, agree with the trial court that Appellant's using the word remember constituted a correction.  The court noted "he corrected what really was a mistake in the way the question was worded so I don't have any problem with that.  He really clearly understands what's going on."  N.T. Suppression, 2/1/18, at 83.  In no way did Appellant's crossing out the word "understand" and substituting it with the word "remember" negate or contradict his earlier and unambiguous affirmation, as detailed above, that he understood his right against self-incrimination and waived the same knowingly and intelligently.  Appellant was duly given the **Miranda** warnings, which he reviewed and initialed.  He manifested the requisite level of comprehension. He therefore obtains no relief.

We now turn to Appellant's second issue, implicating the weight of the evidence.  As this Court has explained:

> On this issue, our role is not to consider the underlying question of whether the verdict was against the weight of the evidence. Rather, we are to decide if the trial court palpably abused its discretion when ruling on the weight claim.  When doing so, we keep in mind that the initial determination regarding the weight of the evidence was for the factfinder.  The factfinder was free to believe all, some or none of the evidence.  Additionally, a court must not reverse a verdict based on a weight claim unless that verdict was so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Habay*, 934 A.2d 732, 736-37 (Pa. Super. 2007) (internal citations omitted), *appeal denied*, 954 A.2d 575 (Pa. 2008). "[A] trial court's denial of a post-sentence motion 'based on a weight of the evidence claim is the least assailable of its rulings.'" *Commonwealth v. Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012) (quoting *Commonwealth v. Diggs*, 949 A.2d 873, 880 (Pa. 2008)).

Here, Appellant argues that the principal evidence against him at trial was grossly inadequate. Specifically, he argues that his convictions "were not based upon any physical or scientific evidence. Nor were they based upon any photographic evidence. [They] were not based upon testimony of any eyewitnesses to any discussions allegedly had between [him] and Nelson, Pone and Murray."[11] Appellant's Brief at 19. Appellant essentially attacks the jury's weight and credibility determinations, and invites us to accept his version of events. We decline the invitation. It is settled that we may not substitute our judgment for that of the factfinder—whether a jury or the trial court—because it is the province of the factfinder to assess the credibility of the witnesses and evidence. *See Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004); *Commonwealth v. Johnson*, 668 A.2d 97, 101 (Pa. 1995) ("an appellate court is barred from substituting its judgment for that of the finder of fact."); *Commonwealth v. Forbes*, 867 A.2d 1268, 1273 (Pa.

_____

[11] As the Commonwealth keenly notes, a lack of physical evidence is unsurprising given Appellant's role in the conspiracy. His task was to tip off Nelson when the victim was on his way home so that the others could rob the victim.

- 18 -

Super. 2005) (stating that "[t]he weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. An appellate court cannot substitute its judgment for that for the finder of fact."). Appellant's claim lacks merit.

In the context of his weight claim, Appellant also argues that his May 15, 2013 statement should have been suppressed because he "was suffering from a painful skin infection, that he was not provided with his pain medication, that he was not seen by a medical professional while in custody and where he did not unequivocally indicate that he understood his ***Miranda*** warnings." Appellant's Brief at 20. At the core, Appellant seeks to re-litigate his suppression claim, which we have addressed above and found to be meritless. Nonetheless, at trial, Detective Graf testified in pertinent part:

> Q. Detective, from start to finish, how long did this statement take?
>
> . . . .
>
> A. Statement started at 6:30, and I believe it ended at 9:10, so it's two hours and 40 minutes.
>
> Q. Throughout that statement, did [Appellant] ever indicate to you that he was in some kind of uncontrollable pain and he needed to stop the interview immediately?
>
> A. **No.**
>
> Q. Did he ever make any requests to say he needed his medication or that he couldn't go on in any fashion?
>
> A. **He didn't.**

Q. If [Appellant], as you advised him in the warnings, wanted to stop the statement, say that he couldn't go on, say he needed his meds, or any of that, what would you have said?

A. We would have stopped the statement, if that's what he wanted to do. And if he needed medication, we do have a nurse in the building. We could have called the nurse. But he never asked for medication.

N.T. Trial, 10/23/18, at 50-51 (emphasis added). Appellant neither took the stand at trial nor did he offer any testimony that would have contradicted Detective Graf's testimony. Here, the jury found Detective Graf's testimony credible. *See DeJesus*, *supra*; *Johnson*, *supra*; *Forbes*, *supra*. No relief is due.

We finally address Appellant's claim that the evidence was insufficient to support this convictions. In this regard, he challenges only his conviction for conspiracy and the application of accomplice liability.[12] Appellant's Brief at 22-23.

A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and

_____

[12] Appellant does not dispute that he could be convicted of the underlying crimes of second-degree murder, robbery and burglary.

inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

We begin with conspiracy. A person commits criminal conspiracy if (1) he intends "to commit or aid in the commission" of a crime; (2) he enters "into an agreement with another [a 'co-conspirator'] to engage in the crime;" and (3) he "or one or more of the other co-conspirators" commits an overt act in furtherance of their agreement. *Commonwealth v. Le*, 208 A.3d 960, 969 (Pa. 2019). Because direct evidence of criminal intent and conspiratorial agreement is rarely available, these elements are generally proven through circumstantial evidence, such as "the relations, conduct[,] or circumstances of the parties, or overt acts on the part of co-conspirators." *Id.* Among the circumstances that are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. *Commonwealth v. Jordan*, 212 A.3d 91, 97 (Pa. Super. 2019). "While such circumstances are insufficient standing alone, they may furnish a web of evidence linking an accused to an alleged conspiracy beyond a

reasonable doubt when viewed in conjunction with each other and in the context in which they occurred." ***Commonwealth v. Carter***, 416 A.2d 523, 524 (Pa. Super. 1979) (internal quotations omitted). Notably, "individuals can conspire to commit a crime—to rob a bank for instance—but abandon the cause or be thwarted prior to completion and still be guilty of conspiracy. All that is required for a conspiracy is an agreement to commit a crime and an overt act in furtherance of the agreement or plan." ***Commonwealth v. Vining***, 744 A.2d 310, 316 (Pa. Super. 1999).

Here, as detailed above, Appellant on May 15, 2013, stated to the police that he met the victim when they both worked together at the Copabanana Club. Appellant provided security for the victim and also picked up and dropped off money and drugs for him. Appellant stated that he knew the individual who was responsible for having the victim shot and killed. This individual (co-defendant Nelson) came to the club on the night of the shooting and told Appellant that the victim "was sitting" on a lot of money and drugs and "[they were] going to get that tonight." Nelson instructed Appellant to call him to let him know when the victim would be getting home. Appellant also admitted that he knew Nelson planned to rob the victim because he had talked about doing it before in March. Nelson initially asked Appellant to accompany the victim and "take one for the team, and act like [he] got robbed too." N.T. Trial, 10/23/18, at 42-43. Appellant claimed that he told Nelson he did not want anything to do with the plan. Nelson, however, told Appellant that he would "***take care of him" by paying Appellant*** for calling him to

tell him when the victim "would be home." *Id.* at 23, 25, 40-43 (emphasis added).  Appellant further stated that on the night the victim was killed, he left Copabanana with the victim in a cab.  Knowing of the plan to rob the victim, Appellant turned down the victim's invitation to come over to the victim's "crib" on the night in question and asked instead to be dropped off at his house.  After the cab dropped him off, Appellant received a call from Nelson and ***told him (Nelson) that the victim was on his way home in a dark-colored Lincoln***.  *Id.* at 43-44.  Critically, after the victim's death, when Appellant was interviewed on May 12, 2013, Appellant failed to share with the police his co-defendants' plan to rob the victim or Nelson's identity.  *Id.* at 46. Furthermore, Weisbrod corroborated Appellant's description of the vehicle the victim was riding in on the night of his murder.  N.T. Trial, 10/10/18, at 94-97.  Finally, Pone confirmed Appellant's role in the conspiracy.  Pone stated that Appellant, a security guard at the Copa, had been involved in the robbery plot and had told Nelson "what the victim had," which was why Nelson "set up the plan to take the [victim's] stuff."  N.T. Trial, 10/24/18, at 157-58.  Viewing the foregoing evidence in a light most favorable to the Commonwealth, we agree with the trial court's conclusion that the Commonwealth proved beyond a reasonable doubt that Appellant conspired to rob the victim.  To recap, in exchange for compensation, Appellant agreed to assist Nelson in facilitating the victim's robbery and overtly acted in furtherance of that by telling Nelson that the victim was on his way home in a dark-colored Lincoln.  Accordingly, Appellant is not entitled to relief.

We now turn to accomplice liability, which does not create a new or separate crime, but merely "provides a basis of liability for a crime committed by another person." *Commonwealth v. Gross*, 101 A.3d 28, 35 (Pa. 2014). This Court has described the concept of accomplice liability as follows:

> Two prongs must be satisfied for a person to be labeled an accomplice. First there must be evidence that the person intended to **aid or promote** the underlying offense. Second there must be evidence that the person actively participated in the crime by soliciting, **aiding, or agreeing to aid** the principal. Further, a person cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid. For purposes of accomplice liability, no agreement is required, **only aid**. With regard to the amount of aid, it need **not be substantial** so long as it is offered to the principal to assist him in committing or attempt to commit the crime. The least degree of assistance in committing the offense is adequate to sustain the finding of responsibility as an accomplice.

*Commonwealth v. Adams*, 39 A.3d 310, 324 (Pa. Super. 2012) (quotation marks and citations omitted) (emphasis added), *aff'd* 104 A.3d 511 (Pa. 2014); *see also* 18 Pa.C.S.A. § 306. Moreover, "[a]bsence or presence at the scene and the participant's role in the complicity are not dispositive of whether accomplice liability exists." *Gross*, 101 A.3d at 35. Accomplice liability "may be established wholly by circumstantial evidence." *Commonwealth v. Mitchell*, 135 A.3d 1097, 1102 (Pa. Super. 2016) (citation omitted), *appeal denied*, 145 A.3d 725 (Pa. 2016). .

Viewing the foregoing evidence in a light most favorable to the Commonwealth, we agree with the trial court's conclusion that the

Commonwealth proved beyond a reasonable doubt that Appellant intentionally aided his co-defendants' efforts to rob the victim. On the night of the victim's murder, Appellant knew of Nelson's plan to rob the victim. In fact, Appellant admitted that Nelson promised to compensate him in exchange for telling him when the victim would be home. Appellant aided Nelson by tipping him off. Specifically, after the victim's cab dropped Appellant off at his house, Appellant informed Nelson that the victim was on his way home in a dark-colored Lincoln. This tip-off resulted in the botched robbery and murder of the victim. Accordingly, Appellant's sufficiency claim lacks merit.

In sum, the trial court did not err in denying Appellant's suppression motion and Appellant's weight and sufficiency claims lack merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/19/21