J-A05042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TYLER C. MCMILLAN | : | |
| | : | |
| Appellant | : | No. 167 WDA 2024 |

Appeal from the Judgment of Sentence Entered August 16, 2023
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s): CP-37-CR-0000903-2020

BEFORE: MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED: MAY 16, 2025**

Tyler C. McMillan appeals from the judgment of sentence, entered in the Court of Common Pleas of Lawrence County, after a jury convicted him of criminal homicide and criminal conspiracy to commit criminal homicide.[1] McMillan challenges: (1) the Commonwealth's amendments to the information regarding an accomplice theory of liability and the added charge of criminal conspiracy; (2) the admission of out-of-court statements of non-testifying co-defendants; (3) the sufficiency of the evidence for each of his convictions; and (4) the weight of the evidence. After review, we affirm.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2501(a), 903.

The trial court set forth the facts and procedural history of this case as follows:

In March of 2020, Schylore Altenburg resided [on] North Lee Avenue[ in] New Castle[,] with his girlfriend, Colleen Gasser, their son[,] and Colleen's [] sister[,] Sierra Gasser.[2]  On March 22, 2020, [McMillan] was visiting [the] Altenburg[-Gasser] residence when he explained to [] Altenburg that Andre Robinson shot at [the vehicle of] Karalinn Perrotta[, McMillan's girlfriend.  McMillan told Altenburg] he "was going to shoot that N---a," referring to [] Robinson.

The next day, [on March 23, 2020,] at approximately 10:00 p.m., [McMillan], [] Perrotta and [] Perrotta's two children were at [the] Altenburg[-Gasser] residence.  At that time, [McMillan] showed [] Altenburg a []9-millimeter Taurus pistol with a teal handle and [] Altenburg overheard [McMillan] state[] he "was going to kill that mother fucker" in reference to [] Robinson.

Similarly, Colleen [] testified she returned home from work that day around 4:00 p.m. and [McMillan], [] Perrotta, Sierra[,] and [] Altenburg's sister, Brooklyn Altenburg,[3] were present at the residence.  Those individuals were present when [Colleen] went to bed at approximately 8:00 or 9:00 p.m.

Khalil Newman [] arrive[d] later at the residence.  [McMillan], [] Perrotta, Sierra[,] and [] Newman were in the kitchen and [] Altenburg observed at least three firearms on the table.  [] Altenburg explained there were conversations between [McMillan] and [] Perrotta[,] who stated they had to clean their firearms and get dressed in proper attire as they planned to murder [] Robinson.

Brooklyn [] testified she visited her brother[] at [the Altenburg-Gasser] residence around 6:00 p.m. on March 23, 2020.  At that time, [] Altenburg, [] Colleen[], Sierra [], [McMillan,] and [] Perrotta were present[,] along with [] Perrotta's two young

---

[2] We refer to Colleen Gasser and Sierra Gasser by their first names.

[3] We refer to Brooklyn Altenburg by her first name and continue to refer to Schylore Altenburg by his last name.

children. [Brooklyn] remained downstairs to ensure [] Perrotta's children were alright as there were firearms present. [] Newman [] arrive[d] at the residence later that night. [Brooklyn] recalled seeing [McMillan], [] Perrotta, [] Newman[,] and Sierra [] making "bombs" or "Molotov Cocktails" out of Twisted Tea bottles. [Brooklyn] also testified she observed firearms and drugs in the kitchen where those individuals were located. According to [Brooklyn], [McMillan], [] Perrotta, [] Newman[,] and [Sierra] all left the residence at the same time. [Sierra ]called [Brooklyn] and instructed her to place the Twisted Tea bottles on the porch, which she did. [Brooklyn] then went to sleep.

Sierra [] testified [that on a prior occasion, McMillan] and Jabril Henley robbed [] Robinson's friend, Chris Murphy, which prompted [] Robinson to shoot at [] Perrotta's vehicle with her children present. [] Perrotta informed Sierra [] that [she] and [McMillan] were going to kill [] Robinson before he had the chance to kill them. [Sierra] explained she was at [the] Altenburg[-Gasser] residence on March 23, 2020, with [McMillan], [] Perrotta[,] and [] Newman. [McMillan] then stated they were going to kill [] Robinson as a result of the aforementioned incidents. At some point during the late evening of March 23, 2020, or early morning hours of March 24, 2020, [] Robinson messaged [Sierra] on Facebook inquiring about having sexual intercourse with her. [McMillan] and Perrotta told [Sierra] to message [Robinson] back [and] instruct[ed Sierra] on what to say. [] Robinson then asked [Sierra] to communicate with him via text messaging, which she did by sending the first text message at 1:12 a.m. on March 24, 2020. [McMillan] and [] Perrotta instructed Sierra [] to message [] Robinson using an application called "Text Now" so it could not be traced to her phone. [Sierra] indicated they left [the] Altenburg[-Gasser] residence several times that night, including one time to retrieve [] Newman.

While they were [driving] in [Perrotta's] vehicle, there were conversations about killing [] Robinson.

Ultimately, [McMillan] and [] Perrotta decided it would be best to wear dark clothing and turn them inside out. They drove to [] Newman's apartment so that he could change his clothing. At that time, [] Perrotta was driving[, McMillan] was in the front passenger seat[,] Sierra [] was in the rear middle seat due to the presence of a child's car seat [on the rear driver's side seat, and] Newman was located on the rear passenger seat[]. They also

- 3 -

drove to [] Perrotta's house to obtain foundation to cover a tattoo on [McMillan]'s hand.

[] Perrotta and [McMillan] urged Sierra [] to continue to message [] Robinson and they told her what to say in those messages[, including,] at 1:29 a.m.[,] inquiring about what vehicle [] Robinson was seated in and where he was located[,] to which [] Robinson responded he was in a red vehicle at McGrath Manor.

While they were driving around, [Sierra] saw a .45-caliber pistol resting on [McMillan]'s lap. They drove past McGrath Manor [] and observed a vehicle matching the description provided by [] Robinson. [] Perrotta then parked the vehicle by some trees. [McMillan] said, "We're going to kill this mother fucker," and he had a firearm on his lap. [McMillan] and [] Newman exited the vehicle and, shortly thereafter, [Sierra] heard gunshots. [McMillan] and [] Newman returned to [Perrotta's] vehicle and [McMillan] stated, "We got this mother fucker." [McMillan] also [stated that] he shot [] Robinson in the back of the head and a location [Sierra] could not recall.

[McMillan] and [] Perrotta then instructed [Sierra] to continue to send messages to [] Robinson to make it appear like they had nothing to do with the homicide. They returned to [the] Altenburg[-Gasser] residence and [Sierra] recalled [] Newman being anxious and having blood on his shirt. [Sierra] also testified [] Perrotta made a comment about wanting to have sexual intercourse with [McMillan] following the homicide.

[On March 24, 2020,] Altenburg was awakened at approximately 2:00 a.m. by five or six gunshots[, and then] again at approximately 5:00 a.m. by [McMillan and Perrotta's] knock at the door[.] Altenburg asked [McMillan] if everything was alright, and [McMillan] responded by instructing [] Altenburg to turn on the news. [Altenburg] did so and there was a [news] report about a homicide at the parking lot of McGrath Manor.

Colleen [] woke up at approximately 5:00 a.m. to go to work when she noticed [McMillan], [] Perrotta[,] and Sierra [] sleeping in the living room. Colleen [] asked [McMillan] what happened and he responded by instructing her to look on Facebook and to drive past McGrath Manor on her way to work. [Colleen] did so and noticed police officers present in the McGrath Manor parking lot. When she arrived at work, [Colleen] checked Facebook and discovered an article about a homicide at the McGrath Manor parking lot.

* * *

[Brooklyn] was awakened by [McMillan], [] Perrotta, Sierra[,] and [] Newman returning to the [Altenburg-Gasser] residence. [] Newman was moving frantically around the house and he had blood on his shirt. [] Perrotta stated, "When we killed him it made my p---y wet," and she wanted to have sexual intercourse with [McMillan]. The parties stipulated to the existence of a video recording of [McMillan] and [] Perrotta having sex[,] which occurred at 3:05 a.m. on March 24, 2020.

[On March 24, 2020, Altenburg discovered the Taurus pistol in a cabinet in his house and removed the magazine and one bullet from the chamber. Altenburg observed there were only three bullets remaining in the magazine. He then placed the firearm and magazine in a paper bag on his front porch and contacted McMillan and Perrotta to retrieve it.]

Shortly after 3:30 a.m. on March 24, 2020, Detective Brandon Hallowich of the New Castle Police Department received a call concerning a deceased male from gunshot wounds in the McGrath Manor parking lot. Upon his arrival, Detective Hallowich discovered a maroon Chevrolet Equinox facing eastbound with its headlights on and [] Robinson located in the driver's seat. Police officers discovered four spent shell casings near that vehicle. Detective Hallowich also located two cell phones near [] Robinson[,] one containing text messages from someone identified as "Cappn Sierra." In addition, Detective Hallowich spoke with Justin Baker, a resident of McGrath Manor, who indicated he saw a Chrysler 300 vehicle[,] similar to the one driven by [] Perrotta[,] in the area that night.

Pennsylvania State Trooper Adam Peth, who is a member of the Forensic Service Unit, arrived at the scene at approximately 6:00 a.m. on March 24, 2020, to aid in the homicide investigation. [Trooper Peth] spoke with Detective Hallowich and took photographs of the scene. [Trooper Peth] observed [] Robinson slumped back in the seat of a maroon vehicle[,] which was still running. Trooper Peth also observed the driver's side window was shot out. He viewed four spent shell casings [] near the rear of the vehicle.

On March 24, 2020, [Officer John Charmo stopped] a Chrysler 300 matching the description provided by [] Baker[.] Perrotta was [the driver], and she was taken to the New Castle Police station.

- 5 -

[Police interviewed Perrotta, who] agreed to a cell phone extraction.

On the same date, [police provided McMillan] with his ***Miranda***[4] warnings and was interviewed by law enforcement. [McMillan] provided a rendition of events[, whereby he] and [] Perrotta arriv[ed] at [the] [Altenburg-]Gasser[] house at approximately 11:00 or 11:30 p.m. [] Perrotta and Sierra [] left shortly thereafter to go to Giant Eagle grocery store to purchase chicken wings. [McMillan] denied any involvement with the events leading to [] Robinson's homicide.

On April 1, 2020, [] Detective Hallowich, Officer Chris Bouye[,] and Officer Brian Lombardo [interviewed McMillan, who] explained he barely knew [] Newman as they met just 6 or 7 months ago. When confronted with video surveillance from [] Newman's residence [showing Newman and McMillan leaving together], [McMillan] stated he merely was purchasing marijuana and [] Newman did not leave with him despite the video demonstrating otherwise. [McMillan] continued to insist he did not know anything about the homicide.

[] Todd Luckasevic[, M.D., performed Robinson's autopsy, which] revealed [] Robinson suffered five gunshot wounds and the cause of death was determined to be the result of multiple gunshot wounds to the head, neck[,] and back.

On December 22, 2020, the Commonwealth filed an information charging [McMillan] with criminal homicide and persons not to possess, use, manufacture, control, sell[,] or transfer firearms.

\*    \*    \*

On May 8, 2023, a jury was selected, but not sworn, in this case[, and at that time, the Commonwealth was permitted to amend the information to add an accomplice theory of liability to the charges. Thereafter, McMillan filed a motion to continue the trial,] which the court [granted]. [Additionally], the next day, the Commonwealth filed a motion [] requesting leave to amend the information to include the charge of criminal conspiracy to commit criminal homicide[.]

---

[4] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

Following [a] hearing, the court issued an order [] den[ying] the Commonwealth's motion[, but the court] indicated it would reconsider the motion [] if the Commonwealth agreed to allow [McMillan] to file a petition for writ of habeas corpus only on the [charge of] criminal conspiracy to commit criminal homicide[,] as [the court believed] that would have the same effect as a preliminary hearing and would adequately protect [McMillan]'s rights to challenge the sufficiency of the Commonwealth's [prima facie] evidence.

On June 2, 2023, the Commonwealth filed a motion to reconsider [its motion to amend the information and] acknowledged [McMillan]'s right to file a petition for writ of habeas corpus only concerning the charge of criminal conspiracy to commit criminal homicide. On the same date, the court issued an order granting the Commonwealth's motion for reconsideration and providing [McMillan] until the close of business on June 9, 2023, to file a petition for writ of habeas corpus[, which McMillan] filed on June 9, 2023[. The Commonwealth filed the corresponding amended conspiracy charge after June 9, 2023, but prior to the hearing thereon on June 21, 2023.]

\* \* \*

[Following the hearing,] on July 6, 2023, [the court] denied [McMillan]'s petition for writ of habeas corpus. [] [McMillan]'s trial commenced with jury selection and opening statements by counsel on July 17, 2023. Following the conclusion of the trial, on July 24, 2023, the jury returned a verdict of guilty on the charges of murder of the first degree and criminal conspiracy to commit murder.

[The court] sentenced [McMillan] on August 14, 2023, to a term of incarceration for the remainder of his natural life for the charge of murder of the first degree and a [consecutive] term of incarceration of not less than 20 years nor more than 40 years for the charge of criminal conspiracy to commit criminal homicide.

On August 24, 2023, [McMillan] filed [a] post[-sentence] motion[,] which [the court] denied[ on January 12, 2024]. [McMillan] filed a timely notice of appeal on January 31, 2024, and [court-ordered] concise statement of errors complained on appeal[.]

Trial Court Opinion, 3/27/24, at 2-13 (footnotes and unnecessary capitalization omitted; some paragraph breaks added).

On appeal, McMillan raises the following issues for our review:

1. The court erred in allowing the Commonwealth on multiple occasion[s] to amend the information, refile a charge of criminal conspiracy to commit homicide[,] and orally amend the information to include conspiracy as a theory of liability for criminal homicide in violation of Pennsylvania Rules of Criminal Procedure 544, 560, [and] 564[,] and in violation of [McMillan]'s Due Process rights guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States.

2. The trial court erred in admitting into evidence statements made by a non-testifying co[-]defendant[s] in violation of [McMillan]'s right to confrontation.

3. The Commonwealth failed to produce sufficient evidence [that McMillan] was an accomplice.

4. The Commonwealth failed to present sufficient evidence to convict [McMillan] of first-degree murder on a theory of criminal conspiracy and the separate charge of criminal conspiracy to commit murder.

5. The verdict was against the weight of the evidence.

Appellant's Brief, at 16 (unnecessary capitalization omitted).[5]

In his first issue on appeal, McMillan argues two sub-issues, namely that the court erred in permitting the Commonwealth to amend the criminal information to include (1) an accomplice theory of liability and (2) a previously dismissed charge of criminal conspiracy to commit criminal homicide. More

_____

[5] On September 9, 2024, this Court granted McMillan's application to exceed the word count limit for his principal brief.

specifically, in his first sub-issue, McMillan claims that the court erred when it permitted the Commonwealth, on the day of jury selection, to orally amend the information to include that "[t]he Actor did act as an accomplice in the shooting of Andre Robinson, causing the victim's death," because the Commonwealth failed to allege necessary further specific facts to support an accomplice theory of liability, including whom McMillan aided or agreed to aid and how that occurred and where it had initially only alleged he was the primary actor. *See* Appellant's Brief, at 40 (*citing* N.T. Scheduled Jury Selection/Motions *in Limine*, 5/8/23, at 7-8). McMillan complains that the Commonwealth's theory of the case prejudiced him when it changed insofar as McMillan was originally charged based on Newman's testimony at the preliminary hearing, which "categorically denied [him] acting as an accomplice, and further specifically denied [that he had] any intention o[f] agreeing to kill [] Robinson."[6] *Id.* at 41. McMillan contends that his argument

_____

[6] Newman testified at the preliminary hearing that the original plan was to spend the evening with McMillan smoking marijuana. *See* N.T. Preliminary Hearing, 11/25/20, at 58, 60, 61. That night, Newman eventually agreed to serve as a lookout while McMillan committed an arson at an unspecified location. *See id.* at 60, 62, 73, 86, 92, 97. Newman further testified that the arson never happened, and he did not know why. Instead, he, McMillan, Perrotta, and Sierra drove around and smoked marijuana. *See id.* While in the car, Newman observed Perrotta and McMillan texting on Sierra's phone, but he did not know who they were texting. *See id.* at 75. At some point in the car, McMillan handed Newman a gun and threatened Newman to follow him outside the car. *See id.* at 66. Newman testified he knew nothing about what was going on and followed. *See id.* After walking through a field, McMillan and Newman came upon a vehicle at McGrath Manor and McMillan told Newman to shoot into the vehicle. *See id.* at 67-68. Newman told
*(Footnote Continued Next Page)*

was prejudicially changed at trial because, originally, McMillan "was relying on three independent witness[es] who only saw one person, described as [a] tall dark[-]skinned male who ran with a limp, a general description that fit [] Newman [and] not [McMillan]." *Id.* Further, McMillan complains that the Commonwealth's timing of the amendment failed to provide "ample notice" because the jury was moments from selection. *Id.* at 41-42. McMillan argues that the court's grant of a continuance after it granted the Commonwealth's motion to amend the information to add an accomplice theory of liability proves that the amendment was not timely, was prejudicial, and in any event, was both contrary to Pennsylvania Rules of Criminal Procedure and did not cure the Commonwealth's failure to allege the necessary facts to support the amendment. *See id.* at 42-48.

Similarly, in his second sub-issue, McMillan complains that the court erroneously granted the Commonwealth's further request to amend the information to include a charge of criminal conspiracy to commit criminal

_____

McMillan that he did not want to shoot, so McMillan snatched the gun out of his hands and shot both weapons into that vehicle before the men ran away and returned to Perrotta's vehicle. *See id.* at 68-70, 101-03. Newman testified that McMillan twice told Newman that he would kill him if Newman told anyone about the shooting—once in the McGrath Manor parking lot and again when the men returned to Perrotta's vehicle. *See id.* at 69, 70-71, 80. Newman further testified that McMillan arranged for him to receive a different ride home after the shooting. *See id.* at 105. Newman also testified that Robinson was his first cousin and that they had lived together weeks before the shooting. *See id.* at 62, 79. Moreover, Newman testified that Robinson had accused him on a prior occasion of shooting a gun at him, but Newman did not know why Robinson believed that to be true. *See id.* at 96.

homicide, which the court ultimately granted at trial after the close of evidence and prior to counsel's closing arguments. McMillan complains that the conspiracy charge was originally dismissed at the preliminary hearing and relies on **Commonwealth v. Williams**, 166 A.3d 460 (Pa. 2017), and Pennsylvania Rules of Criminal Procedure 544 and 564, for the proposition that a charge that was dismissed at a preliminary hearing is entitled to a new preliminary hearing before the same magistrate. McMillan contends that the Rules of Criminal Procedure are the only recourse available under Pennsylvania law. **See** Appellant's Brief, at 49-50. He argues that the court erred in creating its own procedure instead of following that outlined in the rules and by Pennsylvania case law. **See id.** at 51-53. McMillan further alleges that he was prejudiced because the conspiracy amendment relieved the Commonwealth of the duty to call Newman as an eyewitness to the shooting.[7] **See id.** at 54-55. Further, McMillan complains that the court's deadlines were prejudicial insofar as the court required McMillan to file a writ of habeas corpus by June 9, 2023, on the charge of conspiracy to commit homicide, but did not require the Commonwealth to file the amended

_____

[7] McMillan's allegation of prejudice is that because Newman's out-of-court statements are admissible since Newman is an alleged accomplice, the amendment relieved the Commonwealth of the burden to call Newman to testify at trial, thereby impermissibly shifting the burden to McMillan to call Newman or establish unavailability. McMillan does not cite any case law supporting his claim the court committed reversible error in this regard. **See** Appellant's Brief, at 54-55 (**quoting** N.T. Pre-trial Motions Hearing, 5/16/23, at 10-11).

information until June 21, 2023, which the Commonwealth filed only about an hour before the scheduled hearing on McMillan's writ of habeas corpus. *See id.* at 57. McMillan argues that even the amended charges fail to allege a factual basis for what constituted the overt act in furtherance of the conspiracy or by whom that act was committed. *See id.* Moreover, McMillan argues that his defense changed based on that missing information, especially since there was no positive evidence identifying himself or Newman as the principal actor, and there was no evidence of an agreement. *See id.* at 58. Finally, McMillan argues that, because the court held off on ruling on the amendment until just prior to his closing argument, his only opportunity to respond at that late hour was via argument to the jury, especially where he had already rested his evidentiary case.[8] *See id.* at 60-61.

In reviewing a challenge to an amendment of the criminal charges against the defendant, we consider:

> whether the crimes specified in the original indictment or information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended indictment or information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or the elements or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be

---

[8] McMillan neither sought to continue/delay closing arguments, nor sought to reopen the evidentiary record. *See* N.T. Jury Trial, 7/24/23, at 28-30.

prejudiced by the change, then the amend[ment] is not permitted.

[Also,] in reviewing a grant to amend an information, the court will look to whether the [defendant] was fully apprised of the factual scenario which supports the charges against him. Where the crimes specified in the original information involved the same [] elements and arose out of the same factual situation as the crime added by the amendment, the [defendant] is deemed to have been placed on notice regarding his alleged criminal conduct and no prejudice [. . .] results.

Further, the factors which the trial court must consider in determining whether an amendment is prejudicial are:

(1) whether the amendment changes the factual scenario supporting the charges; (2) whether the amendment adds new facts previously unknown to the defendant; (3) whether the entire factual scenario was developed during a preliminary hearing; (4) whether the description of the charges changed with the amendment; (5) whether a change in defense strategy was necessitated by the amendment; and (6) whether the timing of the Commonwealth's request for amendment allowed for ample notice and preparation.

Most importantly, we emphasize that the mere possibility [that an] amendment of [the criminal] information may result in a more severe penalty is not, of itself, prejudice.

*Commonwealth v. Mentzer*, 18 A.3d 1200, 1202-03 (Pa. Super. 2011) (citations, quotation marks, brackets, ellipsis, and unnecessary capitalization omitted). "Further, if there is no showing of prejudice, amendment of an information to add an additional charge is proper even on the day of trial." *Commonwealth v. Picchianti*, 600 A.2d 597, 599 (Pa. Super. 1991).

Similarly, this Court has observed that the defendant must show prejudice to raise a successful challenge based on an alleged violation of the Pennsylvania Rules of Criminal Procedure:

[w]hen dealing with alleged violations of the Rules of Criminal Procedure, our Supreme Court has stated that, the sanction of dismissal of criminal charges should be utilized only in the most blatant cases. Given the public policy goal of protecting the public from criminal conduct, a trial court should consider dismissal of charges where the actions of the Commonwealth are egregious and where demonstrable prejudice will be suffered by the defendant if the charges are not dismissed. Our Court has further held that, even in those situations where in the interests of justice a dismissal is an appropriate consideration to remedy police or prosecutorial misconduct, it is not employed absent a showing of demonstrable prejudice. Dismissal in criminal cases is employed only as a last resort, and is limited to cases of extreme and substantial prejudice. Moreover, [. . . our] Supreme Court held that technical violations of the rules of criminal procedure do not automatically warrant suppression of the evidence, a lesser sanction than dismissal.

***Commonwealth v. Bowman***, 840 A.2d 311, 317 (Pa. Super. 2003) (citations, quotation marks, and footnote omitted). Indeed, this Court has observed that "the Commonwealth's non-compliance with Rule 544, alone, 'does not automatically entitle a defendant to relief.'" ***Commonwealth v. Davis***, 242 A.3d 923, 934 (Pa. Super. 2020) (***quoting Commonwealth v. Pettersen***, 49 A.3d 903, 911 (Pa. Super. 2012)).

As it relates to McMillan's first sub-issue, we have explained that a person may be "held guilty as an accomplice even though charged only as a perpetrator." ***Commonwealth v. McDuffie***, 466 A.2d 660, 661 (Pa. Super. 1983). Moreover, we have concluded that the Commonwealth's opening argument to the jury regarding an accomplice theory of liability effectuates the required notice to the defendant as to that theory of liability. ***See Commonwealth v. Potts***, 566 A.2d 287, 293 (Pa. Super. 1989).

Central to McMillan's second sub-issue presented, Rule 544(A) specifies the mechanism for reinstituting criminal charges:

> When charges are dismissed or withdrawn at, or prior to, a preliminary hearing, or when a grand jury declines to indict and the complaint is dismissed, the attorney for the Commonwealth may reinstitute the charges by approving, in writing, the re-filing of a complaint with the issuing authority who dismissed or permitted the withdrawal of the charges.

Pa.R.Crim.P 544(A). Also, Rule 564 provides the court with guidance on whether to permit amendment:

> The court may allow an information to be amended, provided that the information as amended does not charge offenses arising from a different set of events and that the amended charges are not so materially different from the original charge that the defendant would be unfairly prejudiced. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

Pa.R.Crim.P 564.

Further, in connection with McMillan's first issue, in ***Williams***, this Court found that the timing of the amendment to the information, which added a harassment charge to the existing simple assault charge, unfairly prejudiced the defendant. ***See Williams***, 166 A.3d at 464. In ***Williams***, the Commonwealth's failure to request an amendment to the information until the beginning of trial combined with the trial court's failure to rule on the motion until after the conclusion of closing arguments unfairly surprised the defense, thereby requiring dismissal of the harassment charge and conviction. ***See id.*** Important to the result in that case, we concluded that harassment and simple

assault are different offenses, and the timing and nature of the amendment deprived the defense of any realistic opportunity to prepare. **See id.**

In **Commonwealth v. DeSumma**, 559 A.2d 521 (Pa. 1989), our Supreme Court determined that the defendant suffered prejudice because the Commonwealth's theory added a new offense with new victims. **See id.** at 523. In **DeSumma**, at the start of trial, the defendant was only charged with pointing a loaded gun at one person with the intent of putting that person in fear of imminent bodily injury, but, at trial, was required to defend allegations that he intended to put in fear of bodily injury three others who were passengers of a vehicle. **See id.** at 523. **See also Interest of Becker**, 536 A.2d 1370, 1375 (Pa. Super. 1988) (finding prejudice because amendment changed identity of allegedly endangered person and physical acts which placed other persons in danger, which also caused defense theory to change).

By contrast, in **Pettersen**, this Court concluded there was no prejudice necessitating dismissal. **See Pettersen**, 49 A.3d at 911. In **Pettersen**, the defendant broke into the victim's house, hit her in the head with a hammer in her bedroom, stabbed her more than ten times in the chest and back, and tried to suffocate her by placing a plastic bag over her head. **See id.** at 906-07. The Commonwealth charged Pettersen with three counts of aggravated assault and simple assault, but the magistrate dismissed two counts each of aggravated assault and simple assault under the theory Pettersen's acts were a single criminal episode. **See id.** at 907-08. However, the Commonwealth refiled a criminal information, charging three counts of each offense, which

the trial court permitted, and for which Pettersen was convicted. **See id.** at 908. In finding that it was undisputed that the Commonwealth neglected to follow the procedure set forth in Rule 544 when amending the charges, this Court concluded that Pettersen nevertheless failed to show prejudice because he was on notice of all of his acts alleged, the defense preparation for trial was not hindered, and the Commonwealth did not add newly-alleged victims nor distinct acts. **See id.** at 911.

In **McDuffie**, we concluded that, insofar as timing of an amendment to the information, a change to the named victim, which occurred after the close of evidence, did not cause prejudice to the defense because the Commonwealth did not charge a new or different crime, the amendment did not change the defense theory of the case, and McDuffie did not suffer unfair surprise because he previously had notice of all the alleged facts. **See McDuffie**, 466 A.2d at 662-63. Also, this Court observed that the Commonwealth never expressly rejected the theory of accomplice liability in that case. **See id.** at 662.

Here, as to McMillan's first sub-issue, on the day initially scheduled for jury selection, the Commonwealth sought to amend the information to include an accomplice theory of liability, which the court granted. Immediately thereafter, the court granted McMillan's requested continuance of trial, which trial then did not begin until several weeks later. After our review, under these circumstances, we discern no prejudice to McMillan, especially where trial was ultimately continued and where the Commonwealth initially charged McMillan

with conspiracy and never changed its theory of the case that he acted in concert with others. *See McDuffie*, 466 A.2d at 661. Moreover, the Commonwealth's amendment to the criminal information, adding an accomplice theory of liability, could not have prejudiced McMillan because McMillan may be found guilty as an accomplice even though only charged as a perpetrator. *See id.* Further, the Commonwealth's opening argument to the jury regarding an accomplice theory of liability, *see* N.T. Jury Trial, 7/17/23, at 125, effected the required notice to McMillan. *See Potts*, *supra*. Indeed, the defense opening statement to the jury also recognized the Commonwealth's accomplice theory of liability. *See* N.T. Jury Trial, 7/17/23, at 132 ("And as [the Commonwealth Attorney] said, [Sierra] was an active participant in this homicide, but you won't hear her ever being charged with anything. [Sierra's] not charged as an accomplice. She's not charged as a criminal conspirator."). Accordingly, we conclude that McMillan is not entitled to any relief on his first sub-issue.

As it relates to McMillan's second sub-issue, it is undisputed that the Commonwealth did not follow the procedures set forth in the Pennsylvania Rules of Criminal Procedure when it sought to amend the information to refile McMillan's charge of conspiracy. Nevertheless, at the June 21 hearing scheduled for argument on McMillan's petition for writ of habeas corpus, the Commonwealth presented the testimony of Altenburg and Brooklyn to establish a prima facie case of criminal conspiracy to commit criminal homicide. Specifically, Altenberg testified that, on the night of the shooting,

when the group was still in his home, he heard McMillan and Perrotta express their intent to kill Robinson. *See* N.T. Writ of Habeas Corpus Hearing, 6/21/23, at 34. Altenburg further testified that McMillan and Perrotta were saying that "they planned on murdering [Robinson] that night." *Id.* McMillan and Perrotta "were speaking on how they had to clean their guns and get dressed, and they kept on saying how they had to bleach the guns." *Id.* at 32. Altenburg also recalled Perrotta telling McMillan and Newman to "hurry up" because they had "to leave soon." *Id.* at 33. Moreover, Altenburg stated that he heard Perrotta tell McMillan and Newman what clothes to wear that night, including "black sweatpants, black sweatshirt[,] and dark tennis shoes." *Id.* at 41-42. Finally, Altenburg recalled that when the group returned to his home later, he heard Perrotta state "that her pussy got wet when [McMillan] killed [Robinson]." *Id.* at 47.

Brooklyn also testified at the habeas corpus hearing and stated that she was at the Altenburg-Gasser residence at all relevant times. Brooklyn testified that McMillan, Newman, Perrotta, and Sierra left the Altenburg-Gasser residence that night at the same time together. *See id.* at 56. Brooklyn noted that there were no firearms on the table in the Altenburg-Gasser residence prior to that group of individuals arriving earlier in the evening and that the several guns she observed on the table when the individuals were present in the home all disappeared when the group left that night. *See id.* at 63-64. When the group returned in the early morning hours, Brooklyn heard Perrotta "sitting there talking about how [']*when we killed him, it made*

- 19 -

*my pussy wet,*[']" *id.* at 59 (emphasis in original), and that Perrotta further stated she wanted to have sex with McMillan. Brooklyn also observed Newman had blood spattered on his clothing and noted he was frantically trying to address it. *See id.* at 57.

After our review, we agree that the Commonwealth did not follow the procedures set forth in the rules when it sought to amend the information to add the charge of conspiracy, but this fact alone does not entitle McMillan to relief because he must demonstrate prejudice. *See Davis*, 242 A.3d at 934. Although we acknowledge that the amended charge of conspiracy added a new element to the charged offenses insofar as the Commonwealth was required to prove the existence of an unlawful agreement between McMillan and another to effectuate the homicide, we nevertheless discern no prejudice to McMillan under the circumstances of this case, as evaluated by the factors set forth in *Mentzer*, *supra*, because: (1) the conspiracy charge did not arise from newly alleged events or factual scenarios; (2) throughout the case, the Commonwealth consistently pursued a theory alleging McMillan acted in concert with others and never expressly rejected that theory;[9] (3) the entire

_____

[9] McMillan complains that the Commonwealth argued at the original preliminary hearing that "[w]e have to believe Newman," but then changed its theory on his credibility regarding perpetrator or accomplice liability. Appellant's Brief, at 46-47 (*quoting* N.T. Preliminary Hearing, 11/25/20, at 58). First, credibility is not at issue in preliminary hearings. *See Commonwealth v. Landis*, 48 A.3d 432, 448 (Pa. Super. 2012) (*en banc*) ("it is inappropriate for the trial court to make credibility determinations in deciding whether the Commonwealth established a prima facie case"). *(Footnote Continued Next Page)*

factual scenario was developed during a hearing on McMillan's petition for writ of habeas corpus, which provided McMillan with the same safeguards as a preliminary hearing;[10] (4) the Commonwealth's description of the charges did not change with the amendment since accomplice liability was already amended and included therein; (5) McMillan's defense remained unaltered insofar as he claimed the perpetrator was someone else, that he did not work in concert with anyone, and that he did not commit the murder; and (6) the court provided McMillan with several weeks to prepare for trial after the hearing on McMillan's petition for writ of habeas corpus. *See Mentzer*, *supra*. In conclusion, we agree with the trial court that this case is governed by *Pettersen* insofar as the Commonwealth failed to follow the procedure set forth in Rule 544(A), but that failure did not prejudice McMillan. *See Pettersen*, *supra*. *See also McDuffie*, *supra*.

In any event, even prior to the hearing on McMillan's petition for writ of habeas corpus, the record facts were sufficient to support the conspiracy charge because the testimony at the original preliminary hearing established:

_____

Second, after the hearing on the writ of habeas corpus, as discussed above, the Commonwealth presented sufficient facts from which to establish a prima facie case for conspiracy between McMillan and each of Newman, Perrotta, and Sierra. *See Commonwealth v. Morman*, 541 A.2d 356, 360 (Pa. Super. 1988) (in pretrial setting, focus of habeas corpus hearing is to determine whether sufficient Commonwealth evidence exists to require defendant to be held by government until trial; court should accept into evidence record from preliminary hearing and any additional evidence).

[10] A pre-trial petition for a writ of habeas corpus is similar in purpose to a preliminary hearing. *See Morman*, 541 A.2d at 360.

(1) that police located video from Newman's residence that was recorded on the evening of the incident, which shows that, contrary to McMillan's prior claims to police (that he stayed at the Altenburg-Gasser residence at all relevant times), Perrotta drove her Chrysler 300 to Newman's residence and McMillan and Newman exited the same vehicle and entered Newman's residence, as well as, later, shows that Newman and McMillan again exited the vehicle, and Newman changed into dark clothing and re-entered the Chrysler 300 with McMillan after both exited Newman's residence for the second time; (2) that two stolen firearms were discovered at Perrotta's residence; (3) that McMillan and Perrotta were seen passing Sierra's[11] phone between each other and texting on it while they were driving around on the night of the incident prior to the shooting; (4) that police discovered text messages from Sierra's phone sent to the victim's phone from the night/early morning in question, which police characterized as messages luring the victim to the scene; (5) that McMillan handed Newman a gun in the car and then took it back just prior to the shooting; (6) McMillan's statements to Newman immediately after the shooting, including when they returned to the vehicle—made in Perrotta's and

_____

[11] We recognize that the parties referred to Sierra as a confidential informant (CI) during the preliminary hearing, and her identity had not yet been formally revealed to the defense at that time.  Nevertheless, Sierra's identity was not necessary where Detective Fred Buswell testified at the preliminary hearing that he observed the CI's phone, which contained messages sent to Robinson that appeared to lure Robinson to the scene of the crime and Newman testified that he saw Perrotta and McMillan both passing the CI's phone to each other and texting on it, though Newman did not know the intended recipient of the messages.  *See* N.T. Preliminary Hearing 11/25/20, at 36-37, 75.

Sierra's presence—that if Newman told anyone about the shooting, McMillan would kill him; and (7) that McMillan arranged a different ride for Newman to get home after the shooting. Accordingly, we conclude that McMillan is not entitled to any relief on his first issue on appeal where we are unable to discern any unfair surprise or unfair prejudice to McMillan. *See Mentzer*, *supra*; *cf. Williams*, *supra*.

In his second issue on appeal, McMillan argues that the trial court erred in admitting into evidence the out-of-court statements of non-testifying co-defendants Newman and Perrotta, in violation of his Sixth Amendment right to confrontation. *See* Appellant's Brief, at 61. More specifically, during trial, the trial court admitted Perrotta's and Newman's statements pursuant to the co-conspirator exception to the hearsay rule. *See* Pa.R.E. 803(25)(E). Nevertheless, in his brief, McMillan fails to: (1) specifically identify which of Perrotta's and Newman's statements admitted at trial are now the subject of his challenge on appeal; (2) cite to relevant case law beyond mere boilerplate statements of law; and (3) apply the law to the facts of McMillan's case. Under these circumstances, our review is hindered by McMillan's omissions, and we must find waiver, as explained below.

Appellate claims must be properly developed with citations to authority and the record, or they will be deemed waived:

> The Rules of Appellate Procedure require that appellants adequately develop each issue raised with discussion of pertinent facts and pertinent authority. *See* Pa.R.A.P. 2119. It is not this Court's responsibility to comb through the record seeking the factual underpinnings of an appellant's claim. [*See*]

- 23 -

> ***Commonwealth v. Mulholland***, [702 A.2d 1027, 1034 n.5 (Pa. 1997)]. Further, this Court will not become counsel for an appellant and develop arguments on an appellant's behalf. [***See***] ***Commonwealth v. Gould***, 912 A.2d 869, 873 (Pa. Super. 2006).

***Commonwealth v. Samuel***, 102 A.3d 1001, 1005 (Pa. Super. 2014).

After our review, we find that McMillan's failure to adhere to our appellate rules impedes this Court's meaningful review because he has failed to identify the challenged evidence, cite to the record and to relevant authority beyond boilerplate statements of law, and apply that law to the facts of his case. Therefore, we find this claim waived. ***See Samuel***, ***supra***; ***see also Commonwealth v. Johnson***, 985 A.2d 915, 924 (Pa. 2009) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived"). Accordingly, we conclude that McMillan's second issue on appeal is waived.[12]

In his third and fourth issues on appeal, McMillan challenges the sufficiency of the evidence. Our well-settled standard of review for challenges to the sufficiency of the evidence is as follows:

> the standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond

---

[12] For instance, because McMillan has failed to identify which statements are at issue, we cannot reach the merits of his claim since we are not able to review whether those complained-of statements are testimonial. ***See Commonwealth v. Cheng Jie Lu***, 223 A.3d 260, 265 (Pa. Super. 2019) (success of appellant's Confrontation Clause argument turns on whether co-conspirator's statement to police was testimonial).

a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. [Moreover], in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Kim*, 888 A.2d 847, 851-52 (Pa. Super. 2005) (citation and brackets omitted).

In his third issue on appeal, McMillan claims that the Commonwealth failed to establish sufficient evidence that he acted as an accomplice because the testimony of three independent witnesses at trial demonstrated there was only one person at the scene after the shooting, who did not match McMillan's physical description. *See* Appellant's Brief, at 68. McMillan further notes that each of the three witnesses' testimony described Newman's physical description, rather than his own. *See id.* McMillan argues that there was no evidence he solicited anyone to commit the homicide and no evidence that he aided, or agreed, or attempted to aid others in planning and committing the homicide. *See id.* at 70. We disagree.

By statute, Pennsylvania defines accomplice liability as follows:

(c) Accomplice defined. — A person is an accomplice of another person in the commission of an offense if:

- 25 -

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

(d) Culpability of accomplice. — When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

*     *     *

(f) Exceptions. — Unless otherwise provided by this title or by the law defining the offense, a person is not an accomplice in an offense committed by another person if:

(1) he is a victim of that offense;

(2) the offense is so defined that his conduct is inevitably incident to its commission; or

(3) he terminates his complicity prior to the commission of the offense and:

(i) wholly deprives it of effectiveness in the commission of the offense; or

(ii) gives timely warning to the law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense.

(g) Prosecution of accomplice only. — An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity to prosecution or conviction or has been acquitted.

18 Pa.C.S. § 306.

This Court has previously interpreted Section 306 accomplice liability as requiring a showing the defendant actively participated in the crime and intended to aid or promote the underlying offense to establish guilt:

> An accomplice is equally criminally liable for the acts of another if he acts with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. Therefore, the Commonwealth must present evidence capable of establishing not only that the defendant actively participated in the crime, but also that he intended to aid or promote the underlying offense.

*Commonwealth v. Toritto*, 67 A.3d 29, 34 (Pa. Super. 2013) (*en banc*) (citations and quotation marks omitted). "The amount of aid need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime." *Id.* at 35 (citation and quotation marks omitted). Nevertheless, "[a] defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the scene." *Id.*

To sustain a conviction for first-degree murder under an accomplice theory of liability, "the Commonwealth is required to establish a specific intent to kill. A defendant cannot be convicted of first-degree murder under a vicarious liability theory, such as accomplice or conspiratorial liability, unless the fact-finder determines, upon proof beyond a reasonable doubt, that the defendant personally harbored a specific intent to kill." *Commonwealth v. Jordan*, 212 A.3d 91, 95 (Pa. Super. 2019) (citations, quotation marks, and brackets omitted).

Here, first, we observe that McMillan's claims go to the credibility of the independent witnesses and the weight that should be afforded their testimony,

rather than to the issue of sufficiency. *See Commonwealth v. Wilson*, 825 A.2d 710, 713-14 (Pa. Super. 2003) (review of sufficiency of evidence does not include credibility assessment, which goes to weight of evidence); *see also Commonwealth v. Gaskins*, 692 A.2d 224, 227 (Pa. Super. 1997) (fact-finder makes credibility determinations and challenges to those determinations go to weight of evidence, not sufficiency). Second, when properly considered under our standard of review, viewing the record as a whole in the light most favorable to the Commonwealth, we conclude that there was ample evidence supporting an accomplice theory of liability, including: (a) McMillan told Altenburg that he intended to kill Robinson; (b) McMillan was present with Newman, Perrotta, Sierra, and several firearms, at the Altenburg-Gasser residence the following day when he again discussed his intent in killing Robinson; (c) Perrotta discussed with McMillan the need to clean the firearms and change clothes; (d) McMillan was with Newman when Newman changed his clothes into an all-black outfit and both men then entered Perrotta's vehicle; (e) McMillan and Perrotta instructed Sierra what to text Robinson, and how to do so, while driving in Perrotta's vehicle, which caused Robinson to wait for Sierra at the scene of the eventual homicide; (f) McMillan and Newman both left Perrotta's vehicle together near the location of the shooting, prior to the shooting, with firearms, and both returned together after the shooting; (g) after the shooting, McMillan made incriminating statements about the shooting when he returned to Perrotta's car as well as when he directed Altenburg and Colleen to look at the news

when they asked what was going on; (h) McMillan and Perrotta prepared a sex tape as an alibi to the shooting; (i) Perrotta made incriminating statements about killing Robinson after his death; and (j) a recording of McMillan's phone call from jail, admitting to threatening a witness. *See Jordan*, *supra* (evidence sufficient to convict for first-degree murder under accomplice theory of liability where evidence established defendant: was seen with co-conspirator for some time both leading up to shooting and shortly before shooting, took gun after shooting and hid it, had motive and intent to kill, had knowledge of victim's location, and supplied gun to co-conspirator). Accordingly, we conclude there was sufficient evidence to support McMillan's conviction for first-degree murder under an accomplice theory of lability. *See Kim*, 888 A.2d at 851-52; 18 Pa.C.S. § 306.

In his fourth issue on appeal, McMillan argues that there was insufficient evidence to convict him of criminal conspiracy to commit criminal homicide. *See* Appellant's Brief at 77-78. Specifically, McMillan claims that there was insufficient evidence of any overt act made in furtherance of the conspiracy to commit Robinson's murder. *See id.* at 79-80. Further, McMillan contends that the Commonwealth failed to prove the identity of the shooter, failed to prove that the shooter was one of the named co-conspirators, and thus the jury was forced to impermissibly speculate as to that issue. *See id.* at 81-82. We disagree.

"To sustain a criminal conspiracy conviction, the Commonwealth must establish a defendant entered into an agreement to commit or aid in an

unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance." ***Commonwealth v. Weimer***, 977 A.2d 1103, 1105-06 (Pa. 2009). "The overt act need not accomplish the crime—it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed." ***Id.***

After review, we conclude that all of the sufficient evidence that supports an accomplice theory of liability, as set forth above, also supports McMillan's criminal conspiracy conviction, especially where the overt acts in furtherance of the conspiracy included McMillan's preparation, such as directing Sierra what to tell Robinson and how she should tell him, as well as riding to McGrath Manor with Perrotta and exiting the vehicle with a firearm in hand, with Newman. ***See Kim***, 888 A.2d at 851-52; 18 Pa.C.S. § 903. ***See also Jordan***, 212 A.3d at 96 ("The substantive crime of [c]onspiracy overlaps to a significant if not complete degree with conspiratorial liability since an agreement is a necessary component of both.").

Finally, in his fifth issue on appeal, McMillan challenges the weight of the evidence. Specifically, McMillan argues that Sierra, by her inconsistent, vague, and contradictory testimony, shifted responsibility for the crime away from herself, insofar as she was the one who initially contacted Robinson by text messaging, "It's Sierra." Appellant's Brief, at 84. McMillan further points to texts between Perrotta and Sierra wherein, at 12:45 a.m., Perrotta asks, "What's taking so long[?]" to which Sierra responded, "Waiting on this bitch," thereby clearly indicating Sierra and Perrotta were not together at that time.

Further, McMillan relies on the three independent witnesses who observed only one individual—who matched Newman's physical description—shooting and fleeing the scene. *See id.* at 85. Finally, the murder weapon was never recovered, and McMillan argues that Sierra testified she observed him with a .45 caliber firearm in his lap, but the evidence demonstrated that Robinson was shot by a 9-millimeter caliber firearm, and the Taurus firearm was specifically ruled out as the murder weapon. *See id.* at 86. McMillan is not entitled to any relief on this final claim.

Our well-settled standard of review for a challenge to the weight of the evidence is as follows:

> [T]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An [appellate] court cannot substitute its judgment for that of the finder of fact[,] thus, we may only reverse the [trial] court's verdict if it is so [contrary] to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence, rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Kim*, 888 A.2d at 851 (citations, quotation marks, and ellipses omitted). Indeed, "[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Rogers*, 259 A.3d 539, 541 (Pa. Super. 2021) (citation, quotation marks, and emphasis omitted). The trial court's determination that the verdict was or was not against the weight of

the evidence is "[o]ne of the least assailable" trial court rulings. *Commonwealth v. Widmer*, 744 A.2d at 745, 753 (Pa. 2000).

Here, the trial court denied McMillan's challenge to the weight of the evidence and set forth the following reasons therefore:

> [McMillan] contends the Commonwealth verdict was against the weight of the evidence as the Commonwealth failed to produce credible evidence of [] Robinson contacting Sierra[,] which allegedly prompted the conspiracy. Moreover, [McMillan] claims the Commonwealth failed to produce sufficient evidence to sustain a verdict of guilty for [his] conspiracy [conviction] as there was no evidence of any conversation and/or agreement between [McMillan] and [] Newman. Likewise, [McMilan] asserts the verdict of guilty for conspiracy was against the weight of the evidence as the only evidence the Commonwealth produced was [that McMillan was] present at the crime scene and had mere knowledge.
>
> [The court set forth the applicable law governing sufficiency of and weight of the evidence claims.]
>
> [Here,] the Commonwealth presented the testimony of Altenburg, who stated [that McMillan] was at [the Altenburg-Gasser] residence on March 22, 2020, when [McMillan] explained [that] Robinson [previously] shot at [] Perrotta's vehicle. [McMillan] then stated he was going to kill [] Robinson as a result of a feud [that] was ongoing between [McMillan], [] Perrotta[,] and [] Robinson. The next day, [McMillan] returned to [the] Altenburg[-Gasser] residence along with [] Perrotta, Sierra[,] and [] Newman. [McMillan] again said they were going to kill [] Robinson. [McMillan] and [] Perrotta were making plans to kill [] Robinson[,] which included having firearms present, intending to clean those firearms, making "Molotov Cocktails," and changing clothing to wear darker colors to conceal themselves. Moreover, there was video surveillance at [] Newman's residence demonstrating he went there to change into darker clothing prior to the homicide.
>
> First, [McMillan] contends there was no credible evidence [] Robinson contacted [Sierra] prior to the homicide. According to the testimony of Sierra[,] Robinson sent her a message on

Facebook indicating he desired to have sexual intercourse with her. Upon learning of that message, [McMillan] and [] Perrotta urged [Sierra] to continue speaking with him along with instructing [Sierra] on what to say. When [] Robinson wished to communicate with [Sierra] via text messaging, [McMillan] and [] Perrotta ordered her to install a messaging application, "Text Now," which could not be traced to her phone. Ultimately, the text messaging between [Sierra] and [] Robinson led to [] Robinson informing [Sierra] he was seated in a red vehicle parked at McGrath Manor. At trial, the Commonwealth presented the text messages on the "Text Now" application as Commonwealth's Exhibit 50, which were discovered on [] Robinson's cell phone between [] Robinson and someone with the username "Cappn Sierra." [McMillan] did not object to [the introduction of] those messages[.] Sierra [] testified she was the individual in that text message conversation who was identified as "Cappn Sierra." [The court found sufficient evidence to establish there were communications between Sierra and Robinson prior to the homicide, including on Facebook.]

[McMillan] further asserts those text messages prompted the conspiracy. However, the evidence at trial indicates the conspiracy was prompted by an ongoing dispute between [McMillan], [] Perrotta[,] and [] Robinson[,] which pr[e]ceeded the text messages. In fact, [McMillan] made statements indicating his intention to kill [] Robinson prior to the commencement of the text messages. The evidence presented demonstrates the text messages exchanged by [Sierra] and [] Robinson were utilized to locate [] Robinson.

Using the information from the text messages between [] Robinson and [Sierra], [] Perrotta drove her vehicle past McGrath Manor where they located [] Robinson's vehicle. While they were riding in [] Perrotta's vehicle, [Sierra] observed a .45-caliber pistol on [McMillan']s lap. [] Perrotta then parked the vehicle by some trees up the street from McGrath Manor. [McMillan] said, "We're going to kill this mother fucker," [when] he had a firearm on his lap. [McMillan] and [] Newman exited the vehicle and, shortly thereafter, [Sierra] heard gunshots. [McMillan] and [] Newman returned to the vehicle and [McMillan] stated, "We got this mother fucker." [McMillan] also [stated] he shot [] Robinson in the back of the head and a location [Sierra] could not recall.

Subsequently, they returned to [the] Altenburg[-Gasser] residence and [] Newman appeared to be anxious while having

what appeared to be blood spatter on his shirt. [] Altenburg asked what happened and [McMillan] instructed him to turn on the news. Altenburg did so and the news was reporting about a homicide at the McGrath Manor parking lot. [] Perrotta stated, "When we killed him it made my p---y wet," and she wanted to have sexual intercourse with [McMillan].

[The court found the above evidence was sufficient to sustain McMillan's conviction for first-degree murder based on an accomplice liability theory.]

[Also, t]he aforementioned evidence demonstrates the verdict of guilty concerning the charge of first-degree murder was not against the weight of the evidence. The Commonwealth demonstrated [McMillan] had the specific intent to kill [] Robinson through his direct statements made in the presence of several individuals. Moreover, the Commonwealth presented evidence demonstrating [McMillan] was an active participant in the events and preparations leading to [] Robinson's death. Hence, the verdict rendered by the jury of guilty concerning the charge of first-degree murder was not against the weight of the evidence.

[The court found the Commonwealth presented sufficient evidence to sustain a conviction for first-degree murder based upon an accomplice theory of liability and the separate offense of criminal conspiracy to commit criminal homicide.]

Correspondingly, the aforementioned evidence indicates the verdict of guilty rendered by the jury pertaining to the charge of criminal conspiracy to commit criminal homicide is not against the weight of the evidence. The testimony demonstrated [McMillan] entered into an agreement with [] Perrotta, [] Newman[,] and [Sierra] to kill [] Robinson. They took numerous steps in furtherance of that conspiracy and, ultimately, killed [] Robinson while he was seated in his vehicle. [McMillan] was an active participant in every aspect of this conspiracy as he engaged in the planning, preparation[,] and was present when the fatal gunshots were discharged. Thus, the verdict of guilty regarding the charges of first-degree murder and criminal conspiracy to commit criminal homicide are not against the weight of the evidence.

Trial Court Opinion, 3/27/24, at 25-36 (unnecessary capitalization omitted).

After our review of the record and the trial court's application of the relevant law to the facts of McMillan's case, we cannot conclude that the court abused its discretion in finding that the jury's verdict was not against the weight of the evidence.  **See Kim**, 888 A.2d at 851.  Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 5/16/2025